# HOPT *v.* PEOPLE OF THE TERRITORY OF UTAH.

IN ERROR TO THE SUPREME COURT OF THE TERRITORY OF UTAH.

Submitted January 4th, 1884.—Decided March 3d, 1884.

*Criminal Law—Evidence—Practice—Statutes.*

1. The trial, in Utah, by triers, appointed by the court, of challenges of proposed jurors, in felony cases, must be had in the presence as well of the court as of the accused; and such presence of the accused cannot be dispensed with.

2. The rule that hearsay evidence is incompetent to establish any specific fact which in its nature is susceptible of being proved by witnesses who speak from their own knowledge, reaffirmed.

3. Where, under the statute, it is for the jury to say whether the facts make a case of murder in the first degree or murder in the second degree, it is error for the court to say, in its charge, that the offence, by whomsoever committed, was that of murder in the first degree.

4. A confession freely and voluntarily made is evidence of the most satisfactory character. But the presumption upon which weight is given to such evidence, namely that an innocent man will not imperil his safety or prejudice his interests by an untrue statement, ceases when the confession appears to have been made, either in consequence of inducements of a temporal nature held out by one in authority, touching the charge preferred, or because of a threat or promise made by, or in the presence of, such person, in reference to such charge.

A confession made to an officer will not be excluded from the jury merely because it appears that the accused was previously in the custody of another officer; and the court will not, as a condition precedent to the admission of such evidence, require the prosecution to call the latter, unless the circumstances render it probable that the accused held a conversation with the first officer upon the subject of a confession, or justify the belief of collusion between the officers.

5. A statute which simply enlarges the class of persons who may be competent to testify, is not *ex post facto* in its application to offences previously committed; for it does not attach criminality to any act previously done, and which was innocent when done, nor aggravate past crimes, nor increase the punishment therefor; nor does it alter the degree, or lessen the amount or measure, of the proof made necessary to conviction for past offences. Such alterations relate to modes of procedure only which the State may regulate at pleasure, and in which no one can be said to have a vested right.

The plaintiff in error and one Emerson were jointly indicted in a court of Utah for the murder, in the first degree, of John F. Turner. Each defendant demanded a separate trial, and pleaded not guilty. Hopt being found guilty was sentenced to suffer death. The judgment was affirmed by the Supreme Court of the Territory. But, upon writ of error to this court, that judgment was reversed, and the case was remanded with instructions to order a new trial. *Hopt* v. *People*, 104 U. S. 631.

Upon the next trial the defendant being found guilty was again sentenced to suffer death. That judgment was affirmed by the Supreme Court of the Territory. This writ of error was sued out to review the judgment of the Supreme Court.

*Mr. Thomas Marshall* and *Mr. Lee J. Sharp* for plaintiff in error.

*Mr. Assistant Attorney-General Maury,* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

We are now required to determine whether the court of original jurisdiction, in its conduct of the last trial, committed any error to the prejudice of the substantial rights of the defendant.

1. The validity of the judgment is questioned upon the

ground that a part of the proceedings in the trial court were conducted in the absence of the defendant.

The Criminal Code of Procedure of Utah, § 218, provides that,

"If the indictment is for a felony, the defendant must be personally present at the trial ; but if for a misdemeanor, the trial may be had in the absence of the defendant ; if, however, his presence is necessary for the purpose of identification, the court may, upon application of the prosecuting attorney, by an order or warrant, require the personal attendance of the defendant at the trial."

The same code provides that a juror may be challenged by either party for actual bias, that is, "for the existence of a state of mind which leads to a just inference in reference to the case that he will not act with entire impartiality," §§ 239, 241 ; such a challenge, if the facts be denied, must be tried by three impartial triers, not on the jury panel, and appointed by the court, § 246 ; the juror so challenged "may be examined as a witness to prove or disprove the challenge, and must answer every question pertinent to the inquiry," § 249 ; "other witnesses may also be examined on either side, and the rules of evidence applicable to the trial of other issues govern the admission or exclusion of evidence on the trial of the challenge," § 250 ; "on the trial of the challenge for actual bias, when the evidence is concluded, the court must instruct the triers that is their duty to find the challenge true, if in their opinion the evidence warrants the conclusion that the juror has such a bias against the party challenging him as to render him not impartial, and that if from the evidence they believe him free from such bias they must find the challenge not true ; that a hypothetical opinion on hearsay or information supposed to be true is of itself no evidence of bias sufficient to disqualify a juror. The court can give no other instruction," § 252 ; "the triers must thereupon find the challenge either true or not true, and their decision is final. If they find it true the juror must be excluded." § 253.

It appears that six jurors were separately challenged by the

defendant for actual bias. The grounds of challenge in each case were denied by the district attorney. For each juror triers were appointed, who, being duly sworn, were, "before proceeding to try the challenge," instructed as required by section 252 of the Criminal Code; after which, in each case, the triers took the juror from the court-room into a different room and tried the grounds of challenge out of the presence as well of the court as of the defendant and his counsel. Their findings were returned into court, and the challenge, being found not true, the jurors so challenged resumed their seats among those summoned to try the case. Of the six challenged for actual bias, four were subsequently challenged by the defendant peremptorily. The other two were sworn as trial jurors, one of them, however, after the defendant had exhausted all his peremptory challenges.

No objection was made to the triers leaving the court-room, nor was any exception taken thereto during the trial. The jurors proposed were examined by the triers, without any testimony being offered or produced, either by the prosecution or the defence.

It is insisted, in behalf of the defendant, that the action of the court in permitting the trial in his absence of these challenges of jurors, was so irregular as to vitiate all the subsequent proceedings. This point is well taken.

The Criminal Code of Utah does not authorize the trial by triers of grounds of challenge to be had apart from the court, and in the absence of the defendant. The specific provision made for the examination of witnesses "on either side," subject to the rules of evidence applicable to the trial of other issues, shows that the prosecuting attorney and the defendant were entitled of right to be present during the examination by the triers. It certainly was not contemplated that witnesses should be sent or brought before the triers without the party producing them having the privilege, under the supervision of the court, of propounding such questions as would elicit the necessary facts, or without an opportunity to the opposite side for cross-examination. These views find some support in the further provision making it the duty of the court "when the evi-

dence is concluded," and before the triers make a finding, to instruct them as to their duties. In the case before us the instructions to the triers were given before the latter proceeded with the trial of the challenges.

But all doubt upon the subject is removed by the express requirement, not that the defendant may, but, where the indictment is for a felony, must be "personally present at the trial." The argument in behalf of the government is that the trial of the indictment began after and not before the jury was sworn; consequently, that the defendant's personal presence was not required at an earlier stage of the proceedings. Some warrant, it is supposed by counsel, is found for this position, in decisions construing particular statutes in which the word "trial" is used. Without stopping to distinguish those cases from the one before us, or to examine the grounds upon which they are placed, it is sufficient to say that the purpose of the foregoing provisions of the Utah Criminal Code is, in prosecutions for felonies, to prevent any steps being taken, in the absence of the accused and after the case is called for trial, which involves his substantial rights. The requirement is, not that he must be personally present at the trial by the jury, but "at the trial." The Code, we have seen, prescribes grounds for challenge by either party of jurors proposed. And provision is expressly made for the "trial" of such challenges, some by the court, others by triers. The prisoner is entitled to an impartial jury composed of persons not disqualified by statute, and his life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers, in the selection of jurors. The necessities of the defence may not be met by the presence of his counsel only. For every purpose, therefore, involved in the requirement that the defendant shall be personally present at the trial, where the indictment is for a felony, the trial commences at least from the time when the work of empanelling the jury begins.

But it is said that the right of the accused to be present before the triers was waived by his failure to object to their retirement from the court-room, or to their trial of the several challenges in his absence.

We are of opinion that it was not within the power of the accused or his counsel to dispense with the statutory require-ment as to his personal presence at the trial. The argument to the contrary necessarily proceeds upon the ground that he alone is concerned as to the mode by which he may be deprived of his life or liberty, and that the chief object of the prosecution is to punish him for the crime charged. But this is a mistaken view as well of the relations which the accused holds to the public as of the end of human punishment. The natural life, says Blackstone, "cannot legally be disposed of or destroyed by any individual, neither by the person himself, nor by any other of his fellow creatures, merely upon their own authority." 1 Bl. Com. 133. The public has an interest in his life and lib-erty. Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods. The great end of punishment is not the expiation or atonement of the offence committed, but the prevention of future offences of the same kind. 4 Bl. Com. 11. Such being the relation which the citizen holds to the public, and the object of punishment for public wrongs, the legislature has deemed it essential to the protection of one whose life or liberty is involved in a prosecution for felony, that he shall be personally present at the trial, that is, at every stage of the trial when his substantial rights may be affected by the proceedings against him. If he be deprived of his life or liberty without being so present, such deprivation would be without that due process of law required by the Constitution.

For these reasons we are of opinion that it was error, which vitiated the verdict and judgment, to permit the trial of the challenges to take place in the absence of the accused.

2. Another assignment of error relates to the action of the court in permitting the surgeon who had made a post mortem examination of the body of a corpse which was claimed by the prosecution to be that of John F. Turner, to state that one Fowler identified the body to him.

The surgeon testified that the body examined by him was on the platform at the railroad depot in Salt Lake City, in a wooden case and coffin. The father of the deceased testified that he did not communicate personally with the surgeon, nor see that his son's body was delivered to him; that he left it at the railroad depot in Salt Lake City, in a wooden coffin, inclosed in a box; and the fact that the body of the deceased was originally placed in such a coffin was proved by a witness who put it in the coffin. And yet there was testimony showing that there was a body in the same depot, at or about the time referred to by the surgeon, which, having been placed in a metallic case covered by a wooden box, had been shipped from Echo, by rail, to Salt Lake City; also that it showed injuries "generally similar" to those described by the surgeon. Were there two bodies of deceased persons, at the same depot, about the same time, one "in a wood coffin enclosed in a box," and the other "in a metallic case covered by a wooden box?" There would be some ground to so contend did not the bill of exceptions, in its reference to the body shipped from Echo in a metallic case, imply that there was testimony showing it to be the one that "had been identified as the body of the deceased, John F. Turner." The confusion upon the subject arises from the failure to state that the body which the father of the deceased left at the railroad depot was the same as that shipped from Echo to Salt Lake City. It was, perhaps, to this part of the case the court referred when, in the charge to the jury, it said that the prosecution "has introduced a vast amount of circumstantial evidence." Be this as it may, it was a material question before the jury whether the body examined by the surgeon was the same one that the father of the deceased had left at the depot, and, therefore, the body of the person for whose murder the defendant and Emerson were indicted. If it was not, then all that he said was immaterial. If it was, the evidence otherwise connecting defendant with the death of John F. Turner, the statements of that witness as to the condition of the corpse, the nature of the injuries—whether necessarily fatal or not—observable upon the body examined by him, and how the blows, apparent upon inspection of it, were probably inflicted, became

of great consequence in their bearing upon the guilt or innocence of the defendant of the crime of murder.

. No proper foundation was laid for the question propounded to the surgeon´ as to who pointed out and identified to him the body he examined as that of John F. Turner. He had previously stated that . he did not personally know the deceased and did not recognize the body to be his; he did not know that it was the body which the father of deceased desired him to examine ; consequently his answer could only place before the the jury the statement of some one, not under oath, and who, being absent, could not be subjected to the ordeal of a cross-examination. The question plainly called for hearsay evidence, which, in its legal sense, " denotes that kind of evidence which does not derive its value solely from the credit to be given to the witness himself, but rests, also, in part, on the veracity and competency of some other person." · 1 Greenleaf Ev. § 99 ; 1 Phil. Ev. 169. The general rule, subject to certain well established exceptions as old as the rule itself—applicable in civil · cases, and, therefore, to be rigidly enforced where life or liberty is at stake—was stated in *Mima Queen* v. *Hepburn*, 7 Cranch, 290, 295, to be, " that hearsay evidence is incompetent to establish any specific fact, which fact is in its nature susceptible of being proved by witnesses who speak from their own knowledge." ." That this species of testimony," the court further said, speaking by Chief Justice Marshall, " supposed some better testimony which might be adduced in the particular case, is not the sole ground of its exclusion. Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practised under its cover, combine to support the rule that hearsay evidence is inadmissible." The specific fact to be established by proof of what some one else said to the surgeon as to the identity of the body submitted to his examination was, that it was the body of John F. Turner. What Fowler—who was not even shown to have been placed in charge of the body, nor commissioned to deliver it to the surgeon, nor to be acquainted with the deceased—said, in the absence of the prisoner, as to the identity of the body, was, plainly, hearsay evidence, within the rule recognized in all the

adjudged cases. As such it should, upon the showing made, have been excluded.

3. The next assignment of error relates to that portion of the charge which represents the court as saying: "That an atrocious and dastardly murder has been committed by some person is apparent, but in your deliberations you should be careful not to be influenced by any feeling."

By the statutes of Utah, "murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious or premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design, unlawfully and maliciously, to effect the death of any other human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others, and evidencing a depraved mind, regardless of human life, is murder in the first degree; and any other homicide, committed under such circumstances as would have constituted murder at common law, is murder in the second degree." Compiled Laws Utah, 1873, p. 585. The punishment of murder in the first degree is death, or, upon the recommendation of the jury, imprisonment at hard labor in the penitentiary at the discretion of the court; while the punishment for murder in the second degree is imprisonment at hard labor in the penitentiary for not less than five nor more than fifteen years. Ib. 586.

In view of these statutory provisions, to which the attention of the jury was called, it is clear that the observation by the court that "an atrocious and dastardly murder has been committed by some person," was, naturally, regarded by them as an instruction that the offence, by whomsoever committed, was murder in the first degree; whereas, it was for the jury, having been informed as to what was murder, by the laws of Utah, to say whether the facts made a case of murder in the first degree or murder in the second degree.

It was competent for the judge, under the statutes of Utah, to state to the jury "all matters of law necessary for their information," and, consequently, to inform them what those statutes defined as murder in the first degree and murder in the

second degree. Laws of Utah, 1878, p. 120; Code of Crim. Pro. § 283–4. But it is expressly declared by the Code of Criminal Procedure that, while he may " state the testimony and declare the law," he " must not charge the jury in respect to matters of fact." § 257. The error committed was not cured by the previous observation of the judge that by the laws of Utah the jury are " the sole judges of the credibility of the witnesses and of the weight of the evidence and of the facts." It is rather more correct to say that the effect of that observation was destroyed by the statement at the conclusion of the charge that the murder, by whomsoever committed, was an atrocious and dastardly one, and therefore, as the jury might infer, in view of the language of the statute, was murder in the first degree. The prisoner had the right to the judgment of the jury upon the facts, uninfluenced by any direction from the court as to the weight of evidence.

For the reasons stated, the judgment of the Supreme Court of the Territory must be reversed and the case remanded, with directions that the verdict and judgment be set aside and a new trial ordered.

The assignments of error, however, present other questions of importance which, as they are likely to arise upon another trial, we deem proper to examine.

4. The first of these questions relates to the action of the court, in permitting Carr, called as a witness for the defence, to give in evidence a confession of the prisoner. That confession tended to implicate the accused in the crime charged.

The admissibility of such evidence so largely depends upon the special circumstances connected with the confession, that it is difficult, if not impossible, to formulate a rule that will comprehend all cases. As the question is necessarily addressed, in the first instance, to the judge, and since his discretion must be controlled by all the attendant circumstances, the courts have wisely forborne to mark with absolute precision the limits of admission and exclusion. It is unnecessary in this case that we should lay down any general rule on the subject; for we are satisfied that the action of the trial court can be sustained upon grounds which, according to the weight of authority, are

sufficient to admit confessions made by the accused to one in authority.

It appears that the defendant was arrested at the railroad depot in Cheyenne, Wyoming, by the witness Carr, who is a detective, on the charge made in the indictment. The father of the deceased, present at the time, was much excited, and may have made a motion to draw a revolver on the defendant; but of that fact the witness did not speak positively. The witness may have prevented him from drawing a weapon, and thinks he told him to do nothing rash. At the arrest a large crowd gathered around the defendant; Carr hurried him off to jail, sending with him a policeman, while he remained behind, out of the hearing of the policeman and the defendant. In two or three minutes he joined them, and immediately the accused commenced making a confession. What conversation, if any, occurred between the latter and the policeman during the brief period of two or three minutes preceding the confession was not known to the witness. So far as witness knew, the bill of exceptions states, "the confession was voluntary and uninfluenced by hopes of reward or fear of punishment; he held out no inducement, and did not know of any inducement being held out to defendant to confess." This was all the evidence showing or tending to show that the confession was voluntary or uninfluenced by hope of reward or fear of punishment.

While some of the adjudged cases indicate distrust of confessions which are not judicial, it is certain, as observed by Baron Parke in *Regina* v. *Bald*, 2 Den. Cr. Cas. 430, 445, that the rule against their admissibility has been sometimes carried too far, and in its application justice and common sense have too frequently been sacrificed at the shrine of mercy. A confession, if freely and voluntarily made, is evidence of the most satisfactory character. Such a confession, said Eyre, C. B., 1 Leach, 263, "is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and, therefore, it is admitted as proof of the crime to which it refers."

Elementary writers of authority concur in saying that, while from the very nature of such evidence it must be subjected to careful scrutiny and received with great caution, a deliberate,

voluntary confession of guilt is among the most effectual proofs in the law, and constitutes the strongest evidence against the party making it that can be given of the facts stated in such confession. 1 Greenleaf Ev. § 215; 1 Archbold Cr. Pl. 125; 1 Phillips' Ev. 533-34; Starkie Ev. 73.

But the presumption upon which weight is given to such evidence, namely, that one who is innocent will not imperil his safety or prejudice his interests by an untrue statement, ceases when the confession appears to have been made either in consequence of inducements of a temporal nature, held out by one in authority, touching the charge preferred, or because of a threat or promise by or in the presence of such person, which, operating upon the fears or hopes of the accused, in reference to the charge, deprives him of that freedom of will or self-control essential to make his confession voluntary within the meaning of the law. Tested by those conditions, there seems to have been no reason to exclude the confession of the accused; for the existence of any such inducements, threats or promises seems to have been negatived by the statement of the circumstances under which it was made.

But it is contended that the court erred in not excluding this proof until the prosecution produced the policeman and proved that nothing was said or done by him, in the absence of Carr, which unduly influenced the making of the confession. The argument is, that, possibly, the policeman offered such inducements, or made such threats or promises, that the prisoner, when joined by Carr, was not in a condition of mind to make a confession which the law would deem voluntary. This position, although plausible, is not sustained by authority, nor consistent with sound reason. The circumstances narrated by the witness proved the confession to be voluntary, so far as anything was said or done by him on the immediate occasion. There was nothing disclosed which made it the duty of the court to require as a condition precedent to the admission of the evidence, that the prosecution should call the policeman and show that he had not, when alone with the accused, unduly influenced him to make a confession.

In *Rex* v. *Clewes,* 4 Carr. & Payne, 221; *S. C.* 3 Russell on

Crimes, Sharswood's Edit. 431–32 the prosecution proposed to give in evidence a confession made by the accused before the coroner. It appearing that a magistrate had previously an interview with the prisoner, it was suggested that as he may have been told by that officer that it was better to confess, the prosecution should call him. But the court said that while it would be fair in the prosecutors to call the magistrate, it would not compel them to do so, but if they did not the prisoner might do so if he chose. In *Rex* v. *Williams*, Roscoe's Crim. Evi. 7th Amer. Edit. 54; 3 Russell on Crimes, Ib. 432, it appeared that a prisoner, being in the custody of two constables on a charge of arson, a third person went into the room. The prisoner immediately asked him to go into another room, as he wished to speak to him. They went into that room and the prisoner made a statement to that person. It was contended that the constables ought to be called to prove that they had done nothing to induce the prisoner to confess. But Taunton, J., after consulting with Littledale, J., said :

"We do not think according to the usual practice that we ought to exclude the evidence because a constable may have induced the prisoner to make the statement ; otherwise he must in all cases call the magistrates or constables before whom or in whose custody the prisoner has been."

In *Rex* v. *Warner*, 3 Russ. on Crimes, Sharswood's Edit. 432, the prisoner, when before the committing magistrate, having been duly cautioned, made a confession, in which he alluded to one previously made to a constable. It was remarked by the court that although it was not deemed necessary that a constable, in whose custody a prisoner had been, should be called in every case, yet, in view of the reference to him, he should be called. The constable being called proved that he did not use any undue means to obtain a confession, but he disclosed the fact that he had received the prisoner from another constable, to whom the prisoner had made some statements. As it did not appear that any confession was made to the latter, and only appeared that a statement was made that might either be a confession, a denial or an exculpation, the

court would not require him to be called.   S. C. Roscoe's Crim.
Evi., 7th Amer. Edit. 54–5.

Roscoe (p. 554) states the rule to be, that "in order to induce
the court to call another officer in whose custody the prisoner
has been, it must appear either that some inducement has been
used by or some express reference made to such officer."   Rus-
sell says :

"For the purpose of introducing a confession in evidence, it is
unnecessary, in general, to do more than negative any promise or
inducement held out by the person to whom the confession was
made."   Vol. 3, p. 431.

While a confession made to one in authority should not go
to the jury unless it appears to the court to have been voluntary,
yet as the plaintiff in error chose to let its admissibility rest
upon the case made by the detective, without any intimation
that it would be different if the policeman was examined, and
since there was nothing in the circumstances suggesting collu-
sion between the officers, we do not think the court was bound
to exclude the confession upon the sole ground that the police-
man was not introduced.

5. The last question relates to the action of the court in
admitting, as a witness in behalf of the prosecution, Emerson,
then serving out a sentence of confinement in the peniten-
tiary for the crime of murder, and the judgment against whom
had never been reversed.   His testimony tended to implicate
the defendant in the crime charged against him.   Objection
was made to his competency as a witness, but the objection
was overruled.

At the time the homicide was committed, and when the indict-
ment was returned, it was provided by the Criminal Procedure
Act of Utah of 1878 that "the rules for determining the compe-
tency of witnesses in civil actions are applicable also to criminal
actions and proceedings, except as otherwise provided in this
act."   And the Civil Practice Act of that Territory provided,
§ 374, that "all persons, without exception, otherwise than as
specified in this chapter, may be witnesses in any action or pro-
ceeding.   Facts which, by the common law, would cause the

exclusion of witnesses, may still be shown for the purpose of affecting their credibility," Compiled Laws Utah, 505; further, § 378, that "persons against whom judgment has been rendered upon a conviction for felony, unless pardoned by the governor, or such judgment has been reversed on appeal, shall not be witnesses."

On the 9th day of March, 1882, after the date of the alleged homicide, but prior to the trial of the case, an act was passed which repealed the section of the Civil Practice Act last quoted.

It is contended that such repeal, by which convicted felons were made competent witnesses in civil cases, did not make them competent in criminal cases; in other words, for such is the effect of the argument, those who were excluded as witnesses, under the Civil Practice Act, at the time the Criminal Procedure Act of 1878 was adopted, remained incompetent in criminal cases, unless their incompetency, in such cases, was removed by some modification of the Civil Practice Act expressly declared to have reference to criminal prosecutions.

In this view we do not concur. It was, we think, intended by the Criminal Procedure Act of 1878 to make the competency of witnesses in criminal actions and proceedings depend upon the inquiry whether they were, when called to testify, excluded by the rules determining their competency in civil actions. If competent in civil actions, when called, they were, for that reason, competent in criminal proceedings. The purpose was to have one rule on the subject applicable alike in civil and criminal proceedings.

But it is insisted that the act of 1882, so construed, would, as to this case, be an *ex post facto* law, within the meaning of the Constitution of the United States, in that it permitted the crime charged to be established by witnesses whom the law, at the time the homicide was committed, made incompetent to testify in any case whatever.

The provision of the Constitution which prohibits the States from passing *ex post facto* laws was examined in *Kring* v. *Missouri*, 107 U. S. 221. The whole subject was there fully and carefully considered. The court, in view of the adjudged cases,

as well as upon principle, held, that a provision of the Constitution of Missouri denying to the prisoner, charged with murder in the first degree, the benefit of the law as it was at the commission of offence—under which a conviction of murder in the second degree was an acquittal of murder in the first degree, even though such judgment of conviction was subsequently reversed—was in conflict with the Constitution of the United States.

That decision proceeded upon the ground that the State Constitution deprived the accused of a substantial right which the law gave him when the offence was committed, and, therefore, in its application to that offence and its consequences, altered the situation of the party to his disadvantage. By the law as established when the offence was committed, Kring could not have been punished with death after his conviction of murder in the second degree, whereas by the abrogation of that law by the constitutional provision subsequently adopted, he could thereafter be tried and convicted of murder in the first degree, and subjected to the punishment of death. Thus the judgment of conviction of murder in the second degree was deprived of all force as evidence to establish his absolute immunity thereafter from punishment for murder in the first degree. This was held to be the deprivation of a substantial right which the accused had at the time the alleged offence was committed.

But there are no such features in the case before us. Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.

The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected

by the subsequent statute. Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offence was committed, might, in respect of that offence, be obnoxious to the constitutional inhibition upon *ex post facto* laws. But alterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt, but—leaving untouched the nature of the crime and the amount or degree of proof essential to conviction—only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilt may be placed before the jury, can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offence charged.

*Judgment reversed.*