61  281
75  673

## WILLIAMS vs. THE STATE.

*October 2 — October 14, 1884.*

CRIMINAL LAW AND PRACTICE: CONSTITUTIONAL LAW.  *(1–3) Sufficiency of evidence: New trial: Appeal: Murder.  (4) Exceptions necessary on appeal.  (5) Argument to jury: Explanations.  (6) Waiver of right to confront witnesses.  (7) Redirect examination: What questions proper.*

1. If in a criminal case the evidence fairly tends to prove the guilt of the accused, the trial judge should not set aside a verdict of guilty merely because he may entertain doubts as to the sufficiency of the evidence.

2. Where the trial judge has refused to set aside a verdict on the ground that the evidence was insufficient, this court will not interfere except in a clear case of the want of proof of any fact upon which the guilt of the accused can be fairly predicated.

3. The evidence in this case is *held* to justify a finding that the deceased came to his death through blows inflicted by some person, and was not killed by trains upon a railroad track near which he

was found, and to tend to show that such blows were inflicted by the defendant, who passed along such track about the time in question.

4. In criminal as in civil cases unless objections are made and exceptions duly taken, neither the admission of improper evidence, nor improper comments upon evidence made by counsel to the jury, can be assigned as error on appeal.

5. The prosecuting attorney having asked the accused a certain question, and the judge in excluding it having said that it was "entirely improper" and that the attorney "ought to understand it," it was not improper for such attorney on the argument to state that he asked such question because he was advised by eminent counsel that it was proper.

6. The accused may waive his constitutional right to meet the witnesses face to face.

7. A question, improper upon the direct examination of a witness, may be proper upon his redirect examination if he has been cross-examined upon the subject.

ERROR to the Circuit Court for *Marathon* County.

The opinion states the case.

*G. W. Cate*, for the plaintiff in error.

For the defendant in error there were separate briefs by the *Attorney General* and *J. K. Parish*, District Attorney of Taylor county, and the cause was argued orally by *H. W. Chynoweth*, Assistant Attorney General, and by *Mr. Parish*.

TAYLOR, J.    The plaintiff in error was convicted of murder in the first degree upon an information charging him with the murder of one Thomas Skirbin, on the 23d day of September, 1882, in the county of Taylor.    The trial was had in the circuit court of Marathon county.    After judgment and sentence the accused sued out a writ of error to this court.    A bill of exceptions was settled by the court below, and the record, with the exceptions, is brought before this court for review.    A motion to set aside the verdict and for a new trial was made in the court below upon the whole case, which was refused, and such refusal to set

aside the verdict is the principal ground of error alleged in this court.

The learned counsel for the plaintiff in error insists that there is not sufficient evidence to sustain a conviction, (1) because the evidence fails to show that the deceased, Skirbin, was murdered by any person; and, (2) if there is sufficient evidence to establish that fact, there is no sufficient evidence that the plaintiff in error was the person who committed the murder. After a careful reading of the evidence it seems to us that the contention that the evidence does not justify the finding that Skirbin's death was caused by acts of violence inflicted upon his person by some one, which resulted in his death and were the direct cause of his death, is unfounded. The evidence on this point, briefly stated, is as follows:

On the 23d of September, 1882, Skirbin was at Dorchester, on the Wisconsin Central Railroad, and after doing some business there was intending to take the passenger train north to Westboro; that he was delayed in his business, and missed the train; that afterwards he got on board of a freight train and went as far north as Medford, where the train stopped for the night. He arrived at Medford about 4:52 o'clock P. M., according to train time; at all events, before 5 o'clock P. M.; at that place he bought some crackers and cheese, and had some conversation with a man by the name of Brown, who sold him the crackers and cheese, about purchasing tickets to bring his wife and children to this country from Europe. To this man he said he was going to Westboro, on the line of the road, about sixteen miles north of Medford, and would come back again on Monday to buy the tickets. He had some money with him at Medford. Brown changed a $20 bill for him. He left the store of Brown shortly after 5 o'clock P. M. There was no train going north until 3 o'clock the next morning. He was not seen in Medford after he left Brown's, so far as the evidence shows, and he was not seen afterwards (unless

he was seen, as the state claims, on the railroad about four and one half miles north of Medford shortly after 6 o'clock that evening) until the next morning, at about 8 o'clock, when he was discovered lying at the foot of the embankment of the railroad track, about half a mile south of the Whittlesey station, and about six miles north of Medford. He lay back of and under a small pine tree, almost insensible, with a bruise and cut upon the back part of his head, and another on the side of his face and head. Some blood was discovered between the rails of the track nearly opposite where he lay, and there were evidences that he had been dragged from the place where the blood was found between the rails down the embankment to the place where he lay by the pine tree. The appearance of the blood found between the rails indicated that it had been there for some time, as it was partially dried, and the wounded man was shivering as with cold. His clothes were not torn, and there were no wounds on his person except those on his head. There was a club found on the track near by, with which the wounds on the head might have been made. Skirbin died about a week after, from the effects of the wounds on his head; and from the time he was found to the time of his death he was in a semi-unconscious state, so as to be unable to give any definite account of how he received his injuries. When found he had no money on his person. No trains had passed over the road after he was seen at Medford about 5 o'clock P. M. until he was found, except two: one going north about 3 o'clock in the morning of the 24th, and one south, about 7:20 in the evening of the 23d of September. The persons in charge of those trains did not see the deceased at any place on the track. Some question is made upon the point whether the injuries inflicted upon the head of deceased caused his death. We, however, think the evidence on that point quite satisfactory.

We think upon this evidence it was purely a question of

fact for the jury, and not one of law for the court, whether Skirbin came to his death by blows inflicted upon him by some person, and their finding from that evidence that he was in fact murdered is entirely sustained by the evidence. We think the presumption that he fell from the train going up at 3 o'clock in the morning, or that he was struck by the train passing south at 7:20 in the evening, is clearly rebutted by the evidence, if it were plausible to entertain a presumption of his injury in that way. The wounds on his person were not such as would be likely to be received had he been struck by an engine passing on the track; and there is no evidence that he ever was on board of the train going north at 3 o'clock in the morning. We are satisfied that the jury were fully justified in finding that Skirbin came to his death by blows inflicted upon him by some person, and that his injuries were not the result of any accident.

Upon the other point, whether the plaintiff in error inflicted the blows which caused the death of Skirbin, the evidence is, to my mind, less satisfactory. The facts upon which it is claimed that the jury might rightfully find that the plaintiff in error inflicted the fatal blows upon the deceased are the following:

It is shown that the defendant was in Medford on the 23d of September, 1882, in the afternoon, and that he must have remained there until about the time Skirbin left to go north upon the railroad track. Upon this point the evidence is not clear, but it is certain that shortly after 6 o'clock on the evening of the 23d the defendant was going north on the railroad track at a point four miles and ninety rods north of Medford, and one mile and 229 rods south of the place where Skirbin was found the next morning, and that after stopping and talking with the witness McCarty a very short time, he went on north on the railroad track, stating to McCarty that he was going to Chelsea. At this point it is claimed by the state that Skirbin was in company with the

defendant, and that he walked ahead of defendant while defendant was talking with McCarty, and when defendant started up the track the deceased was only about eighty rods ahead of him. All the parties agree that there was another man on the track, and that he was only a few feet from the defendant when defendant stopped to talk with McCarty. The only doubt is as to the identity of this person with the deceased.

About 7:20 P. M. the engineer on the train coming south says he saw a man on the track going north, a short distance north of where the deceased was found the next morning; that his attention was called to his presence from the fact that he remained on the track until the train was very near to him, when he stepped aside. His hat. was drawn down over his eyes and face, so that he could not see his face. This person, the state claims, was the defendant. Shortly after this train passed south, some men passed south on the road on a hand car, and saw a man on the railroad bridge, a short distance north of where the deceased was found, whom they claim to identify as the defendant. Their attention was called to him from the fact that someone had placed a board across one of the rails of the track on the bridge; that they were unable to stop the car before it came to the board, but, fortunately, the car went over the board without getting off the track. After passing the board they stopped the car to remove the board, and when it stopped the man they claim to recognize as defendant was standing on the end of a tie or timber of the bridge, and when they stopped he stepped on the track and passed on north. The next seen of the defendant was at the house of the witness Correan, whose house is seven miles and 147 rods from Medford, and one mile and 175 rods from the place where deceased was found. Correan says the defendant arrived at his house after 9 o'clock in the evening. His testimony as to the time of his arrival there is supported, to

some extent, by the testimony of two other witnesses who were at work with Correan that day, took their suppers at the house of Correan, and then went from his house to Whittlesey over the same road the defendant would come to his house. These witnesses saw nothing of defendant on their way from Correan to Whittlesey. They say they left Correan's between 8 and 9 o'clock in the evening.

The witness Correan says the defendant seemed excited when he came in; that he had no particular business with him, and the next morning said he wanted to go fishing to a lake, back in the woods several miles. Defendant had no fish-pole or fishing tackle with him. Defendant says he went to the lake the next day, and from there back to his home, but caught no fish. There was some evidence tending to show that defendant had no money on the 23d of September, or very little, and that afterwards, on Tuesday, he had some money, and purchased money orders at the post-office of the value of $11; and evidence of his statements about the man who was seen with him by the witness McCarty. He states this man left the railroad and went into the woods before he came north as far as the place where deceased was found. He also stated that he went directly from the place where McCarty saw him to the house of the witness Correan, and did not stop at all on the way. Claims he arrived at Correan's between 7 and 8 o'clock in the evening. Considerable evidence was given as to his conduct while in prison, and his attempts to escape from the prison. But the main facts in the case, which have a tendency to fix the guilt of the defendant, are those stated more at length above.

It seems to us that it cannot be said that the evidence referred to above does not tend to prove the guilt of the defendant. We think, notwithstanding the nature of the evidence given on the point, the jury would be justified in finding, from all the evidence in the case, that the man seen

on the railroad track with the defendant, at the time he talked with the witness McCarty, was the deceased. The only evidence which is opposed to such inference is the statement of the defendant himself, that the man then seen on the road left the track and went into the woods before he arrived at the place where the deceased was found the next morning. His statement is most improbable, from the fact that it must have been getting dark at the time he says he left the track and went into the woods, and the place was of a nature to render it difficult for a person to travel through had it been daylight. And there is no proof, except the statement of the defendant, that any other man than deceased was on the track that evening. If the deceased was on the track at the time McCarty and the other witness saw the defendant, then the defendant is proved to have been in the immediate vicinity of the deceased at the time he received the fatal blows, and no other person is shown to have been there who could have inflicted them. The evidence also tends to show that he was seen in the immediate vicinity of the deceased shortly after the blows must have been inflicted.

Again, the evidence tends very strongly to show that the defendant was about three hours in traveling from the place where McCarty saw him to the house of Correan,— a distance of about three miles and eighty rods. The defendant does not attempt to explain why he was so long on the way, says he did not stop, and insists, against the testimony of three witnesses, that he arrived at Correan's an hour or two earlier in the evening than they fix the time at. This is the only explanation he attempts to give. His reason for being at Correan's at all that evening is most unsatisfactory. He says he came there to go fishing the next day, but admits he had no conveniences for fishing, and, in fact, caught no fish. These facts, connected with other slightly suspicious circumstances growing out of the contradictory statements of the

defendant in regard to the matter, do not leave the case destitute of all evidence tending to establish the guilt of the defendant. The weight of the evidence and its convincing effect was for the jury and not for the court. In criminal cases, the effect which the evidence shall have as tending to establish the guilt of the accused is for the jury. If they find it insufficient to establish guilt, there is no power in the court to set aside their verdict, though the trial judge might be convinced that the verdict was against not only the weight of evidence, but against all the evidence. On the other hand, if there be evidence which fairly tends to prove the guilt of the defendant, and the jury find the guilt, the court cannot properly set aside such verdict because he may entertain doubts as to its sufficiency to establish such guilt.

Ordinarily, the decision of the trial judge upon the question of granting a new trial on the ground that the evidence is insufficient to support the verdict, is held conclusive upon this court; and this rule is adhered to in a criminal case where the record contains evidence from which the guilt of the accused can be fairly deduced. We do not think the record in this case shows such a failure of evidence as would justify this court in overruling the judgment of the trial judge in refusing a new trial. 1 Bish. Crim. Proc. §§ 1273, 1274, and cases cited in notes; *State v. Lamont*, 2 Wis. 437; *Cook v. Helms*, 5 Wis. 107, 108; *Van Doran v. Armstrong*, 28 Wis. 236, and cases referred to in opinion; *Smith v. Wallace*, 25 Wis. 55; *Dickinson v. Ritchie*, 50 Wis. 365; *Seaman v. Burnham*, 57 Wis. 568; *McCann v. Meehan*, 53 Wis. 541; *Bonneville v. State*, id. 680, 688. In determining this question of granting a new trial, we are not unmindful of the rule which requires the state, in a criminal action, to establish its case against the defendant by the production of evidence of a more certain and convincing character than is required in a civil action. But the effect of the evidence as to its convincing character is first addressed to the jury, and

afterwards to the trial judge on the motion for a new trial; and when both the jury and the trial judge have expressed themselves satisfied with the verdict, this court will not interfere except in a clear case of the want of proof of any fact upon which the guilt of the accused can be fairly predicated.

The learned counsel for the plaintiff in error alleges for error improper conduct of the attorney for the state on the trial of the action. In the bill of exceptions it is said that the attorney for the state, in his reply to the argument of the counsel for the defendant, was proceeding to sum up the case generally, when he was interrupted by the counsel for the defendant objecting to such course, and insisting that the attorney in his closing argument should confine himself strictly to a reply to the defense, and thereupon the presiding judge directed the attorney for the state to proceed, but to confine himself to a reply to the defendant's counsel. It is then stated that the counsel proceeded to comment upon some proofs made on the part of the state which were undoubtedly proper to have been commented on in the opening argument of the state to the jury, and might have been a proper comment in reply to the argument of the defendant's counsel. No objection or exception was taken to the comments so made by the attorney for the defendant. They cannot, therefore, be considered as a ground of error in this court. *Rollins v. State*, 59 Wis. 55; *State v. Clifford*, 58 Wis. 113, 124; *Brown v. Swineford*, 44 Wis. 282, 292. Other comments are stated as made by the attorney for the state, and which are claimed to have been inadmissible; but, as no objections were taken to them, this court cannot consider them.

The following remark, made by the counsel for the state in his argument to the jury, was objected to: "I offered to prove by the defendant that he, the defendant, went to the house of Charles Powell in the night-time, when Powell was treasurer of the school district, because I was advised

by eminent counsel that it was proper to ask him if such was not the fact, and in case he denied it, to call other witnesses and prove that he did, in order to impeach him." Upon an examination of the record, it appears that the counsel on the trial did ask the defendant, when on the stand as a witness, the question stated in this remark, and that, upon his asking the question, the counsel for the defendant objected, and made the following remark to the court: "I want the gentleman to be instructed that he shall not go on with such questions for the purpose of prejudicing this man with the jury," and thereupon the judge made the following remark to the attorney for the state: "That is entirely improper, and you ought to understand it." The remark made in the presence of the jury, to which the counsel for the defendant objected, undoubtedly referred to this proceeding on the trial, and was made as a reason why he had asked the question of the defendant which the presiding judge deemed highly improper. It was clearly intended as his excuse for an act which the presiding judge had characterized as improper on the part of the attorney for the state, and was not intended to prejudice the defendant with the jury. It was undoubtedly so considered by the presiding judge, or he would, as he had before, have admonished the state's attorney that he was violating the rules which should govern the prosecutor for the state.

It is also alleged as error that the evidence of Dr. Hubbell, taken at the inquest, was permitted to be read in evidence on the trial. This evidence was read by the consent and stipulation of both the state and the attorney for the accused. No exception was taken to its being read on the trial, and the rule in criminal proceedings is the same as in civil, that, in order to protect himself against the reception of improper evidence on the trial, exception must be taken. *Rollins v. State* and *State v. Clifford, supra;* 1 Bish. Crim. Proc. §§ 117, 119.

But it is said that, as the constitution provides that the accused shall enjoy the right to meet the witnesses face to face, he cannot waive that right, and therefore the stipulation of the counsel that it might be read goes for naught. It is well settled that the accused may waive his right to be confronted with the witnesses on the trial. 1 Bish. Crim. Proc. §§ 117, 118, 119, 1205; *State v. Polson*, 29 Iowa, 133; *Hurley v. State*, 29 Ark. 17; *State v. Bowen*, 4 McCord, 254; *Johnson v. State*, 27 Texas, 758; *Miller v. State*, 25 Wis. 384.

Some exceptions were taken to the instructions given to the jury. After reading the instructions, we are unable to find anything erroneous in them. The law of the case was stated in such a clear and concise way that the jury must have fully comprehended the principles of law that should govern them in the discharge of their duty to the state and the prisoner.

It is also alleged as error that the court permitted the witness Semple to answer the following question on his redirect examination by the state: "Did you state to any of these parties, soon after, that you thought it was *Williams?*" The witness Semple had stated that he thought the person he saw on the bridge near Whittlesey on the evening of the 23d of September, 1882, was the defendant, *Williams.* Upon his cross-examination it was attempted to show that it did not occur to him on the evening when he saw the man on the bridge that it was *Williams,* and that it was only upon thinking of the matter afterwards that he came to the conclusion that it was defendant. And on his cross-examination the counsel for the defendant had asked him this question: "I want you to tell me as near as you can when you told anybody this was *Fred. Williams;* when you first notified anybody it was *Fred. Williams.*" This was objected to by the state, but was allowed to be answered. This question, we think, opened the door for the state to ask the question to which objection was made by the defendant.

It was the same matter inquired about by the defendant; and, as was said by the court, it was in explanation of what had been drawn out of the witness by the defendant himself. As an independent offer on the part of the state, it was probably objectionable as evidence given to bolster up the witness's testimony. Given as it was, after the witness · had been examined on that subject by the defendant, it was clearly admissible.

Upon the whole record, we find no errors which would authorize this court in setting aside the verdict and granting a new trial.

*By the Court.*— The judgment of the circuit court is affirmed.