## GROVE v. UNITED STATES. *

(Circuit Court of Appeals, Fourth Circuit. January 17, 1925.)

No. 2281.

I. **Criminal law ⟨⟩662(1)—Jury ⟨⟩32(3)— After mistrial, caused by illness of juror, continuance of trial by consent before the remaining 11 and a substituted juror held lawful.**

During a trial a juror became ill and a mistrial was declared. By consent of counsel for both parties the trial was continued before the remaining 11 jurors and a new juror. The witnesses who had testified were recalled, to testify that their former testimony was true, after which it was read to the new jury by the stenographer. *Held*, that the jury was legally constituted, and the trial legally conducted, and that defendant was not deprived of his constitutional right to be confronted with the witnesses against him.

2. **Criminal law ⟨⟩662(8)—Defendant may waive right to be confronted with witnesses.**

A defendant may waive his right to be confronted with the witnesses against him by consenting to the admission as evidence of testimony previously given by them, as taken down by a stenographer.

3. **Criminal law ⟨⟩877—Defendant held not entitled to acquittal because of acquittal of codefendants.**

Where an indictment for conspiracy charged that not only those indicted, but others to the grand jury unknown, were parties to the conspiracy, and the evidence also implicated others, the acquittal of all except one of those indicted did not entitle him to an acquittal.

4. **Criminal law ⟨⟩37—Facts held not to raise question of entrapment.**

Where persons approached by defendant, and solicited to enter into a transaction in violation of the Prohibition Act, informed prohibition agents, and at their instance accepted and went forward with the transaction, until defendant and others were arrested, there was no question of entrapment for submission to the jury.

Waddill, Circuit Judge, dissenting.

*Certiorari denied 45 S. Ct. 511, 69 L. Ed. —.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Criminal prosecution by the United States against Harry C. Grove, otherwise known as Hoppy Grove. Judgment of conviction, and defendant brings error. Affirmed.

Robert F. Leach, Jr., of Baltimore, Md. (Curran & Leach, of Baltimore, Md., on the brief), for plaintiff in error.

A. W. W. Woodcock, U. S. Atty., and Morton P. Fisher, Asst. U. S. Atty., both of Baltimore, Md.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

WOODS, Circuit Judge. The indictment charges conspiracy by John Routzahn, Wilbur Routzahn, Albert White, and Harry C. Grove, and other persons unknown, to transport and possess 1,000 cases of whisky on and prior to November 9, 1923, stored in the warehouse of the Outerbridge-Horsey Company, of Frederick, Md., distillery warehouse No. 17, in a manner not authorized by the National Prohibition Act. The overt act charged against the two Routzahns, Albert White, and other persons unknown was that they went to the vicinity of bonded warehouse No. 17, and by means of a false and fraudulent permit presented to A. M. Becker, secretary and treasurer of the warehouse company, obtained possession of 250 cases of whisky and loaded it into an automobile truck. Overt acts were charged against Grove in paying H. Walter Ganster, attorney, and Louis Mann, secretary and treasurer, of the Outerbridge-Horsey Company, on 1,000 cases of whisky, $5,000 on November 7th, $25,000 on November 9th, and $10,000, the final payment, on the same date, and on the last payment receiving a certificate showing the serial numbers of 1,000 cases of whisky.

The defendants Routzahn and White were acquitted, and the defendant Harry C. Grove convicted. Grove assigns error in the conduct of the trial, in refusing to direct the jury to acquit him, and in the refusal of other requests to charge.

[1] Much stress is laid on the contention that the defendant did not have a constitutional jury trial. The trial began on March 24th and proceeded regularly until the morning of March 26th. On that day, when the court met as usual at 10 o'clock in the morning, the trial judge stated to the jury that trial of the case would have to be suspended because of the sickness of one of the

jury, who was not able to come to the trial. The jury was excused until the following morning at 10 o'clock, to which time court was adjourned.

On March 27th, in view of the continued sickness of the juror, counsel for both parties agreed that the jury be discharged and a new jury be sworn to try the case, the new jury to consist of the remaining 11 of the jury first sworn and an additional juryman; that the testimony taken during the two days of the trial should be read to the new jury by the stenographer; that either party would have the right to recall the witnesses, if they were desired for further examination; that the witnesses who had already testified be recalled to the stand and sworn; that they be asked whether or not the testimony already given by them was true; and that the witness Becker be re-examined, if the stenographer who took his testimony did not return in time to read it to the jury.

The new jury was then sworn, and the court asked if counsel desired to make any statement to the jury. The prosecuting attorney made a brief statement, and, after him, counsel for defendants stated their case. The prosecuting attorney suggested that the 11 jurors who had already heard the testimony be excused; which suggestion was opposed by counsel for defendants. The court stated to the jury that the circumstances were unfortunate, but that time would be saved by having the stenographer read the testimony, as agreed by counsel.

Thereupon H. Walter Ganster, Jr., was recalled to the stand, sworn, and testified that he had testified in the case before 11 of the present jurymen and Mr. Bayne, the sick juryman, and that the testimony he had then given was true. Witness was excused, and Louis Mann was recalled to the stand and sworn. He testified that the testimony he had given in the trial before 11 of the present jurymen and Mr. Bayne was true. This witness was then excused. Aaron N. Becker was then recalled to the stand, and testified that he had been sworn before in the case, and that the testimony he then gave was true. Witnesses were then excluded, by desire of counsel for both sides. The testimony of Ganster, Mann, and Becker was then read by the stenographer to the jury.

There can be no ground for saying that a legal jury was not provided and sworn after the discharge of the first jury, consequent on the illness of juror Bayne. When the new juror, Breeback, was called, there were 12 jurors presented to the defendant.

He not only made no objection to any individual juror, or to the manner in which the jury were presented, but affirmatively accepted and agreed to the panel as it stood. But, even if defendant had objected to the method of presentation, this court has recently held in Tierney v. United States, 280 F. 322, after full consideration, that the presentation to the defendant for challenge or acceptance of 12 qualified jurors at one time is legal. We adhere to that decision, which is in accordance with decisions of the Supreme Court in three cases: Pointer v. United States, 151 U. S. 396, 14 S. Ct. 410, 38 L. Ed. 208; Lewis v. United States, 146 U. S. 378, 13 S. Ct. 136, 36 L. Ed. 1011; St. Clair v. United States, 154 U. S. 134, 147, 148, 14 S. Ct. 1002, 38 L. Ed. 936.

Nor were the defendants deprived of the right to be confronted with the witnesses against them and have them testify in their presence and the presence of the jury. Each witness was separately resworn, counsel for the government was ready to re-examine them, and the defendants had the opportunity to recross-examine each of them. Thus, not only substantially, but in the strictest technical sense, the defendants were confronted with the witnesses. In consenting to the reading of their evidence before taken, defendants may well have had very good reasons for preferring that the witnesses should not repeat their testimony in person. They might well have thought that the testimony against them, repeated by the witnesses themselves, would make a greater impression against them, not only on the new juror, but on the 11 who had already heard it. They might well have thought, also, that a re-examination and recross-examination might educe additional testimony against them. Whatever the defendants' reason, they considered it to their advantage to consent to the reading of the evidence, and the law did not require the trial judge to override that consent.

[2] We think no authority can be found, and no substantial reason can be stated, for saying that defendant cannot, by request and consent, substitute a written statement of a witness for his formal oral examination. On the contrary, after full discussion of the subject, the Supreme Court has held that defendant may waive the right to be confronted with the witnesses by agreeing to the admission as evidence of the statements of the witnesses made out of court not even under oath. The court says, in Diaz v. United States, 223 U. S. 442, 450,

32 S. Ct. 250, 252 (56 L. Ed. 500, Ann. Cas. 1913C, 1138):

"That this is so is a necessary conclusion from the adjudged cases relating to the like right secured by the Constitutions of the several states and the Constitution of the United States. Thus it is held that the right is waived where, by the consent of the accused, the prosecution is permitted to read in evidence the testimony of an absent witness given in some prior proceeding, Hancock v. State, 14 Tex. App. 392; Rosenbaum v. State, 33 Ala. 354; Williams v. State, 61 Wis. 281; State v. Polson, 29 Iowa, 133; or a statement of what such a witness would testify, if present, as embodied in an agreement made to avoid a continuance or to dispense with the presence of the witness, State v. Wagner, 78 Mo. 644, 648; State v. Fooks, 65 Iowa, 452; State v. Mortensen, 26 Utah, 312; State v. Lewis, 31 Wash. 75, 88; or the deposition of such a witness taken within or without the jurisdiction, Butler v. State, 97 Ind. 378; State v. Vanella, 40 Mont. 326; Wightman v. People, 67 Barb. 44; People v. Guidici, 100 N. Y. 503, 508; People v. Murray, 52 Mich. 288."

[3] Had the indictment limited the charge of the conspiracy to Grove, Wilbur Routzahn, John Routzahn, and Albert White, the acquittal of the three last-named would have been equivalent to an acquittal of Grove, since it requires more than one man to commit the crime of conspiracy. But the indictment also charges that other persons unknown were parties to the agreement, and there was evidence tending to prove the implication of persons not mentioned by name. One of the trucks in which the whisky was to be loaded was licensed in the name of King Bros. The other truck had a false Virginia license, taken from the Central Automobile Company of Alexandria, Va. Wilbur Routzahn testified that one Barney Winkel lent him this license, and Grove testified that Winkel lent him part of the money paid for the certificates as a means of getting whisky. Winkel was Grove's brother-in-law and on intimate terms with him. Cleveland Grove, a brother of the defendant, lent him part of the money to pay for the whisky. Cleveland Grove also, to protect the defendant from robbery, patrolled the road at the Jug Bridge, where part of the money was paid. When the last payment was made, Cleveland Grove and one King secreted themselves in the schoolhouse nearby for the same purpose. The defendant also borrowed money to make the payment from Will Grove, Eddie Grove, and one Kidweyler. The defendant Grove testified he had never told anybody of the contemplated unlawful transaction, but admitted that he might have told Cleveland Grove that he was buying some liquor. None of these persons—Winkel, Cleveland Grove, King, Eddie Grove, Will Grove, Kidweyler—testified in denial or explanation of their connection.

The jury, then, had before them, on the one hand, the circumstances set out, tending to show that persons not mentioned in the indictment were implicated as conspirators, and, on the other, testimony of the defendant Grove only, that they were not. It makes no difference that these circumstances were made known by the testimony of Grove. The jury was at liberty to accept part of his testimony and reject the remainder. The verdict, finding one or more of these persons not named in the indictment to have been implicated with the defendant Grove in the conspiracy charged, was well supported by the evidence to which we have referred.

[4] The evidence furnished no foundation for the request on the subject of entrapment. Ganster and Mann, who were agents of the distillery, and from whom the defendant Grove arranged to buy the certificates and thus get possession of the whisky, testified that they went into the transaction at Grove's request, and that they made known the whole matter to the prohibition agent. But they were never agents of the officers of the law. The evidence shows that Ganster informed the prohibition officers that Grove had proposed to him and Mann a scheme to defraud the government and get the whisky for sale. Upon this information, the officers did encourage Ganster and Mann to go forward with the scheme proposed by Grove, and to pretend to accept it, so that Grove might be detected; but the evidence does not show that the officers authorized or encouraged, or were ever informed of, a proposition by Ganster and Mann to enter into the conspiracy. The case, therefore, presented no question of entrapment, and the District Judge correctly so charged the jury. We have recently restated the familiar rule on the subject, in Newman v. United States, 299 F. 128:

"It is well settled that decoys may be used to entrap criminals, and to present opportunity to one intending or willing to commit crime. But decoys are not permissible to ensnare the innocent and law-abid-

ing into the commission of crime. When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor."

The brazen trickery and deceit by which Ganster and Mann defrauded the defendant Grove of at least $25,000 was commented on by the District Judge in language of strong condemnation, in instructing the jury to receive their testimony with great caution. It was not error to decline to repeat the same thing in the almost identical language of the defendant's request.

We find no error, and judgment must be affirmed.

WADDILL, Circuit Judge (dissenting). I cannot concur with the majority of the court in so much of their opinion as gives approval to the action of the trial court in selecting and impaneling the new jury, after the mistrial had been ordered, or to the method adopted in the introduction of testimony on the new trial. The court undoubtedly had the right to declare the mistrial, upon being satisfied of the serious illness of the juror, and to proceed de novo with the new trial; that is, that the new jury should have been drawn, selected, impaneled, and sworn in the manner prescribed by law (Judicial Code, §§ 276 to 281, 286, 287 [Comp. St. §§ 1253–1258, 1263, 1264]); the trial, including the introduction of testimony, to be proceeded with as in any other case.

There seems to be no dispute as to what occurred, viz. a single person was selected, and along with the 11 well jurors already in the jury box sworn as the jury to try the case, and in the progress of the trial testimony as taken down by a stenographer at the former trial was read to the jury, the stenographer proving his notes, and some of the witnesses were called to the stand, who testified the stenographer's notes embraced their evidence. What was done was in accordance with the almost universal custom and practice in civil cases in like circumstances, but is there adopted by consent of the parties, and cannot be thought of save by such consent.

The majority opinion says consent was given here, and, because of such consent, approval is apparently given thereto. But the law applicable to civil cases is wholly unlike and dissimilar to that in criminal cases. In the former, parties litigant may, in respect to their private and civil matters, give consent to many things as between themselves. But in criminal cases an entirely different condition exists, and what was done in this case, as well with respect to the choice and impaneling of the jury, as to the introduction of testimony by reading the stenographer's notes of the former trial, was not warranted by law, because it denied, on the one hand, to the accused his legitimate right and opportunity of challenge in the selection of the jury at the new trial, and to the accused and the new jury, especially the new juror, the opportunity to see and hear all the witnesses on such second trial; that the same did not constitute due process of law, 11 of the jurors so remaining being disqualified to serve by reason of their connection with the first trial, and the odd juror because, like the 11, he had not been drawn for the trial then being had, and the proceeding was wholly void and in plain contravention of the Fifth and Sixth Amendments to the federal Constitution.

Briefly, it may be said that the accused (Amendment 6) is guaranteed the right to a speedy and public trial by an impartial jury; that he cannot be deprived (Amendment 5) of his life, liberty, or property without due process of law; that he cannot (Amendment 5) for the same offense be twice put in jeopardy, nor be compelled to be a witness against himself; and that he has the right (Amendment 6) to be informed of the nature and cause of the accusation, and to be confronted with the witnesses against him. The fact that the accused may have agreed to what was done will not assure the validity of the same, as the constitutional requirements regarding the manner and method of criminal trials, as affecting the life and liberty of the citizen, cannot be waived by an accused when present at the trial. Hopt v. Utah, 110 U. S. 578, 579, 4 S. Ct. 202, 28 L. Ed. 262; Thompson v. Utah, 170 U. S. 345 to 354, inclusive, 18 S. Ct. 620, 42 L. Ed. 1061 (8-juror case); Freeman v. United States, 227 F. 743 to 749, inclusive, 142 C. C. A. 256; Ex parte McClusky (C. C.) 40 F. 71, 76; State of North Dakota v. Hazledahl, 2 N. D. 521, 52 N. W. 315, 16 L. R. A. 150; Watson on the Constitution, vol. 2, pp. 1431 to 1485, chs. 53 and 54 (on the Fifth and Sixth Amendments to the Constitution); Cooley's Constitutional Limitations, pp. 213, 214; also cases bearing upon the ste-

nographer's notes, viz.: Motes v. United States, 178 U. S. 467, 469, 470–474, 20 S. Ct. 993, 44 L. Ed. 1150, inclusive; Reynolds v. United States, 98 U. S. 145, 160, 161, 25 L. Ed. 244 (in this case the witness was kept away by the accused); Diaz v. United States, 223 U. S. 448, 449, 32 S. Ct. 250, 56 L. Ed. 500, Ann. Cas. 1913C, 1138, (this case recognized the doctrine contended for here, but the deposition there was put in by the defendant).

That consent cannot be given by an accused in circumstances as here, and be relied upon by the government as the basis to sustain a conviction of one of its citizens, given while in jeopardy, restrained of his liberty, and on trial for a grave and serious felony, is too old to need citation of authority. "Consent in a criminal case cannot bind the defendant, 'since criminal charges are not the subject of arbitration, and any infliction of criminal punishment upon an individual, except in pursuance of the law of the land, is a wrongdoing to the state, whether the individual assented or not.'" Cooley's Constitutional Limitations, p. 576.

" 'The natural life,' says Blackstone, 'cannot legally be disposed of or destroyed by any individual, neither by the person himself, nor by any other of his fellow creatures, merely upon their own authority.' 1 Bl. Com. 133. The public has an interest in his life and liberty. Neither can be lawfully taken, except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods. The great end of punishment is not the expiation or atonement of the offense committed, but the prevention of future offenses of the same kind." Mr. Justice Harlan, in Hopt v. Utah, supra, 110 U. S. 574, 579, 4 S. Ct. 202, 204 (28 L. Ed. 262).

"The right to waive a right does not exist when the matter concerns the public as well as the individual. Thus, the waiver of the trial of a crime by jury involves the setting on one side of the tribunal constituted by law for that purpose and the substitution by consent of one unknown to the law. It is not competent for the accused and the district attorney to change by consent the constitution of the tribunal provided for the trial of crimes. Between the waiver of a jury in a civil case and its waiver in a trial for crime there are fundamental differences. The one involves only property rights of the parties, rights over which they have dominion. The other involves the liberty or life of the citizen. This is a matter over which the accused has not dominion. The state, the public, are concerned that neither shall be affected save by due process of law." Judge Lurton, later a justice of the Supreme Court, in Low v. United States (C. C. A. 6th Cir.) 169 F. 86, 91, 92, 94 C. C. A. 1, 6.

"There are a number of cases where an attempt has been made to substitute a juror for one of the 12 who have been impaneled to try the case, and where, owing to sickness or some disqualification, one of the original panel has been excused. The rule seems to be well established in such cases that the trial must begin de novo, in order that the defendant may have his full right of challenge, and in order that the new juryman may both see and hear all the witnesses." Judge Rogers, in Freeman v. United States, supra (C. C. A. 2nd Cir.) 227 F. 732, 749, 142 C. C. A. 256, 273, citing a large array of authority in support thereof.

The majority opinion cites and relies upon Diaz v. United States, 223 U. S. 442, 450, 32 S. Ct. 250, 56 L. Ed. 500, Ann. Cas. 1913C, 1138, to sustain the ruling of the District Court permitting a stenographer's notes of evidence taken at a former trial to be read to the jury. This case, like that of Reynolds v. United States, supra, 98 U. S. 145, 160, 161, 25 L. Ed. 244, supports the general doctrine contended for here, which ordinarily excludes stenographer's notes; but the ruling in that case was based upon the fact that the accused himself offered the stenographic notes to be read, and in the Reynolds Case, upon the fact that the defendant was responsible for the failure of the witness to appear. These are well-known exceptional cases, and upon the general proposition support, rather than militate against, anything said in this dissent.