**HIGHWAY COMMISSION OF TEXAS et al. v. VAUGHN et al. (No. 7074.)\***

(Court of Civil Appeals of Texas. Austin. Oct. 27, 1926. Rehearing Denied Nov. 10, 1926.)

**1. Bridges ☞10(1)—State highway commission held authorized to expend funds to construct interstate bridge, as against contention that river was not within Texas and did not form her boundary.**

State highway commission *held* authorized to expend state highway funds to construct bridge across Red river between Texas and Oklahoma, as against contention that Red river is not within Texas and does not form her boundary.

**2. Bridges ☞10(1)—State in constructing interstate bridge is not limited in expenditures to that portion of bridge within its territorial limits (Const. art. 3, § 56, subd. 6; Rev. St. 1925, art. 6796).**

Under Const. art. 3, § 56, subd. 6, state, in expending funds in construction of bridge over Red river between Texas and Oklahoma, is not restricted in its expenditures to that portion of the bridge solely within its territorial limits, in view of Rev. St. 1925, art. 6796.

**3. Constitutional law ☞70(3)—Whether statute authorizes state to pay more than her equitable proportion of interstate bridge held not a question over which court has control (Const. art. 3, § 56, subd. 6; Sp. Act 39th Leg.).**

Whether special act of Thirty-Ninth Legislature, authorizing construction of bridge over Red river between Texas and Oklahoma, authorizes state to pay more than her equitable proportion of bridge, *held* not a question over which courts have control, in view of Const. art. 3, § 56, subd. 6.

**4. Statutes ☞95(1)—Statute authorizing interstate bridge held not violative of Constitution prohibiting taxation except by general laws and for public purpose (Sp. Act 39th Leg.; Const. art. 8, § 3).**

Special act of Thirty-Ninth Legislature, authorizing construction of bridge over Red river between Texas and Oklahoma, *held* not violative of Const. art. 8, § 3, prohibiting taxation except by general laws and for public purpose.

**5. Constitutional law ☞68(4)—Legislature has sole power to determine under Constitution whether interstate bridge serves a public purpose (Const. art. 3, § 56, subd. 6).**

Under Const. art. 3, § 56, subd. 6, authorizing Legislature to erect interstate bridges, Legislature has sole power to determine whether bridge serves a public purpose.

**6. States ☞119—Statute authorizing interstate bridge held not violative of constitutional provision prohibiting loaning credit of state, etc. (Sp. Act 39th Leg.; Const. art. 3, §§ 50, 51).**

Special act of Thirty-Ninth Legislature, authorizing erection of bridge over Red river between Texas and Oklahoma, *held* not violative of Const. art. 3, §§ 50, 51, prohibiting lending credit of state or from making grant of public money to individuals, etc.

**7. Statutes ☞97(1)—Special statute authorizing erection of interstate bridge held authorized under Constitution (Const. art. 3, § 56, subd. 6; Sp. Acts 39th Leg.).**

Special Act of Thirty-Ninth Legislature, authorizing erection of bridge over Red river between Texas and Oklahoma, *held* authorized under Const. art. 3, § 56, subd. 6, forming exception to prohibition of special and local laws.

**8. Constitutional law ☞58—Statute authorizing erection of interstate bridge held not unconstitutional for encroaching on prerogatives of Governor (Special Act 39th Leg.; Const. art. 4, § 10, article 3, § 56, subd. 6, article 9, § 1, and article 11, §§ 1, 2).**

Special act of Thirty-Ninth Legislature, authorizing erection of bridge over Red river between Texas and Oklahoma, *held* not violative of Const. art. 4, § 10, for infringing on prerogatives of Governor, in view of article 3, § 56, subd. 6, article 9, § 1, and article 11, §§ 1, 2.

**9. Statutes ☞184, 215—Statute must be construed in light of attending circumstances and object to be attained.**

Statute must be construed in light of attending circumstances and object to be attained.

**10. Constitutional law ☞58—Statute authorizing interstate bridge, though providing for special agency, held not to deprive Governor of constitutional right of participating in negotiations (Sp. Act 39th Leg.; Const. art. 4, § 10).**

Special act of Thirty-Ninth Legislature, authorizing erection of bridge over Red river between Texas and Oklahoma, though providing that another agency is to act in negotiating with Oklahoma upon construction of bridge,

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
\*Writ of error refused January 12, 1927.

*held* not to deprive Governor of right, under Const. art. 4, § 10, of participating therein or of agreeing to and approving final contract made by that agency with Oklahoma.

**II. Constitutional law ⊂⊃48—Statute should not be declared unconstitutional unless it clearly appears to be so.**

Statute should not be declared unconstitutional unless it clearly appears to be so, and every reasonable doubt as to its validity must be resolved in its favor.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by Stanley J. Vaughn and others against the Highway Commission of Texas and others for an injunction. From an order granting a perpetual injunction, defendants appeal. Order reversed, injunction dissolved, and proceedings dismissed.

Dan Moody, Atty. Gen., and L. C. Sutton, Asst. Atty. Gen., and Weeks, Morrow, Francis & Hankerson, of Wichita Falls, for appellants.

George Mendell, Jr., and Hart, Patterson & Hart, all of Austin, for appellees.

BLAIR, J. The appeal is by the state highway commission from an order of the district court of Travis county, perpetually enjoining it from paying out of state highway funds any part of the costs of constructing a bridge crossing Red river at a point on the north boundary line of Wichita county and of Texas, except necessary costs to construct the portion situated within the territorial limits of Texas.

The south approach and end and about 310 feet of the bridge are located south of the south cut bank of Red river, which cut bank is the north boundary line of Texas and of Wichita county. The south line of the state of Oklahoma is the medial line between the north and south cut banks of the river, and the space lying between the medial line and the south cut bank belongs to the federal government, but over which Oklahoma has civil and criminal jurisdiction. The north approach and end of the bridge are in Cotton county, Okl., and the remaining portion, about 2,700 feet, is over the territory just described as belonging to the state of Oklahoma and the federal government.

The bridge represents the joint project of the state highway commission of Texas, Wichita county, Tex., the state of Oklahoma, acting through its state highway commission, and the department of public roads of the federal government, who will be hereinafter referred to as the parties. They discussed the project early in 1925, and each agreed to co-operate in it. Thereafter, March 6, 1925, the Texas Legislature passed the following special act:

"Section 1. That the commissioners' court of Wichita county be and are hereby authorized to co-operate with the state highway commission of the state of Oklahoma and all other public authorities in said state having power to act either for the state of Oklahoma or for any subdivision thereof in the construction and maintenance of a free bridge across Red river at such point in the north boundary line of Wichita county as may be designated and agreed upon.

"Section. 2. To that end the commissioners' court of Wichita county are hereby authorized to agree with the said authorities for the state of Oklahoma for the construction and maintenance of a free bridge across Red river at some point of the north boundary line of Wichita county, Tex., to be designated. That the character of said bridge and specifications therefor may also be agreed upon by said Wichita county and said authorities of the state of Oklahoma, and also the method of letting the contract and all other matters connected with the construction and maintenance of said bridge may be agreed upon by said authorities, provided, however, that not more than twenty-five per cent. of the cost of construction and maintenance of said bridge shall be borne by Wichita county, Texas.

"Section 3. That the funds necessary to pay the amount authorized to be paid by Wichita county may be appropriated by the commissioners' court of Wichita county from the general road fund or may be paid by the issuance of warrants against said funds or by the issuance of bonds and the general laws of the state of Texas as to the construction of public highways and bridges and the appropriation of moneys and the issuance of warrants and bonds therefor shall be applicable in so far as is consistent with this act.

"Section. 4. The bridge to be constructed under this Act shall be a part of the public highways of the state of Texas, and the board of highway commissioners is hereby authorized to give state aid upon such terms and conditions as is authorized by any law now in existence or which may be hereafter enacted. The said state highway commission of the state of Texas is authorized to solicit and procure federal aid in said enterprise under any law here now existing or hereinafter enacted by the Congress of the United States."

Negotiations were then begun which culminated in formal agreements between the parties to construct the bridge. The plans, specifications, and location were agreed upon, and the costs were to be paid one-fourth by Wichita county, Tex., one-fourth by the state of Oklahoma, through its state highway commission, one-fourth by the state highway commission of Texas, and one-fourth by the department of public roads of the federal government, which federal allotment was to be paid through the state highway commission of Texas. Notices of the highway commissions of Texas and Oklahoma and of Wichita county were issued to contractors to submit proposals for the construction of the bridge, and bids were submitted and received by Oklahoma and Wich-

⊂⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ita county, as agreed between the parties on October 23, 1925. Prior to the date mentioned the state highway commission of Texas was enjoined by the district court of Travis county from further participating in the negotiations, and it took no official part in the reception of bids. Upon the advice of the representative of the department of public roads of the federal government, the bids of October 23, 1925, were rejected because of defects in the advertisement for them, and the state of Oklahoma and Wichita county, Tex., readvertised for proposals to be received on January 18, 1926, and on said date the bid of the Austin Bridge Company for the approximate sum of $260,000 was declared to be the lowest and best and was accepted.

On February 1, 1926, in accordance with the agreement of the parties, Wichita county entered into a written contract with the Austin Bridge Company to erect the bridge, which recites that each of the parties were to pay for it as above stated, but also provides that Wichita county shall be responsible for the full amount of the contract in any event. The contract is accompanied by the bridge company's bond, payable to Wichita county, and conditioned to secure faithful performance of the contract. The injunction against the highway commission of Texas was dissolved by agreement of the parties, and immediately thereafter on March 31, 1926, the commission marked and indorsed this contract: "Approved." On April 9, 1926, the Governor of Texas made the following indorsement on this contract:

"April 9, 1926.

"Examined, ratified and confirmed in all things as my act and deed as Governor of the state of Texas in so far as I am required and authorized by law to make said contract.

"Miriam A. Ferguson.
"Governor of Texas."

On March 2, 1926, the state of Oklahoma, acting through its state highway commission, entered into a written contract with Wichita county, Tex., acting through its commissioners' court, agreeing to pay said county one-fourth the costs of the bridge. The agreement also provides that the parties to it shall have equal control of the bridge, and shall share its maintenance expenses equally, and provides for arbitration in the event a dispute should arise concerning the contract. On this contract the Governor of Texas made the following indorsement:

"State of Texas, County of Travis:

"The foregoing contract having been submitted to me and the same having been duly examined, I, Miriam A. Ferguson, Governor of the state of Texas, do hereby consent to, ratify and confirm the same, together with each and all of the negotiations concerning the same, and I consent and agree to do and perform all things in connection therewith in so far as I am authorized or required as Governor of the state of Texas, under the Constitution and laws of said state. Miriam A. Ferguson,
"Governor of the State of Texas."

This indorsement bears no date, but the facts show it to have been made on the date of the trial of this suit, or about April 9, 1926.

The authority of the highway commission to make the expenditure of the state highway funds was attacked by appellees and apparently sustained by the trial court, upon substantially the following grounds: (1) That Red river is not within Texas and does not form her boundary. (2) That Texas cannot pay the costs of any portion of the bridge beyond her territorial limits. (3) That the special act of the Thirty-Ninth Legislature above quoted as authorizing the bridge is illegal as violative of the following constitutional provisions: (a) Article 8, § 3, which prohibits the levy and collection of taxes, except by general laws and for public purposes only. (b) Article 3, §§ 50 and 51, which prohibits the Legislature from lending the credit of the state, or from making a grant of public money to individuals, etc. (c) Article 3, § 56, which forbids, except as therein provided, the passage of local or special laws. (d) Article 4, § 10, which provides that the Governor of this state "shall conduct, in person, or in such manner as may be prescribed by law, all intercourse and business of the state with other states. * * *"

[1] The contention that Red river is not within Texas and does not form her boundary is without merit with respect to the subject-matter of this suit. While the south cut bank does legally and technically form the boundary with reference to Texas civil and criminal jurisdiction and ownership over the territory, still, with reference to preventing social and commercial intercourse with her sister state, a primary object for her entering the Union, the river forms the barrier separating them. A bridge on either bank of the river will not remove the* barrier. The structure required must necessarily rest on each high bank of the river, span the entire territory between them, including the river, with its ends opening into each of the states, and when this is done there is of course but one structure with reference to its use. Therefore, from that viewpoint, not only the banks, but the river and all territory necessary to be spanned by the bridge in order to effect the purposes of social and business intercourse between the states, is the true boundary. The case of Keiser v. Union County, 156 Pa. 315, 26 A. 1066, by the Supreme Court of Pennsylvania, expresses our view upon this question as follows:

"A stream is equally the boundary line, whether the line is its middle thread, or its westernmost ripple. To find the boundary, you

must find the stream, and then the part of it defined as the line; but, wherever that is, it is the stream, and it is the boundary only because of that fact. No matter whether the boundary is the middle or the edge of the stream, the bridge must connect with both banks; and the moment it does so, even if only with an abutment, there is no longer any one county in which it is located."

See, also, Dodge County v. Saunders County, 70 Neb. 442, 97 N. W. 617, which holds with respect to a bridge connecting them that the stream was the boundary although the south bank was in fact the dividing line between the two counties.

[2] The contention that Texas cannot pay the costs of any portion of the bridge beyond her territorial limits is also without merit. Article 3, § 56, subd. 6 of the Constitution, authorizes the Legislature to enact local or special laws "for the erection of bridges crossing streams which form boundaries between this and any other state." No limitation is placed upon this grant of power either with reference to the territory over which an interstate bridge might be constructed or as to its cost. In fact, the makers of the fundamental law knew that one end of an interstate bridge must of necessity rest within another state, that territory of both states must be spanned by it, that the occasion might arise when such a bridge would be of vital necessity, or at least of much greater value to this state than to the other state into which it opened, and they left all these matters to the Legislature without any restrictions upon its authority to construct the bridge. The wisdom of the provision is apparent, for as was said in Washer v. Bullitt County, 110 U. S. 588, 4 S. Ct. 252, 28 L. Ed. 249:

"It may frequently happen that a bridge or causeway across the boundary line between two counties may be of vital necessity to one and of little use to the other."

In some jurisdictions by legislative enactment the costs of bridges crossing boundary streams between counties, or in some instances between cities, are to be borne equally by the respective counties or cities interested. This arbitrary rule has been upheld upon the presumption that such bridges are of equal value to the interested parties. Lapham v. Rice, 55 N. Y. 479. The constitutional provision makes no such rule with reference to the bridge in question, and places no such limitation upon the Legislature's authority to build it. The broader rule was recognized by the Texas Legislature in article 6796, where it is provided that adjoining counties may contract to build bridges over boundary streams "upon such equitable terms as the commissioners' court of each county interested may agree upon."

[3] But whether the special act authorizes Texas to pay more than her equitable pro-

portion of the bridge is immaterial, and is a question over which courts have no control, because the Constitution authorizes the Legislature to build it, which necessarily implies the authority to pay for it, without any limitation upon its authority, and the Legislature's act in the matter is therefore supreme, for, says Cooley:

"Restraints on the legislative power of control must be found in the Constitution of the state, or they must rest alone in the legislative discretion. If the legislative action in these cases operates injuriously to the municipalities or to individuals, the remedy is not with the courts. The courts have no power to interfere, and the people must be looked to, to right, through the ballot box, all these wrongs." Cooley, Const. Lim. (6th Ed.) p. 229.

[4, 5] The special act is not violative of either of the constitutional provisions set forth under appellees' third attack upon the highway commission's authority to expend money for the construction of the bridge beyond the territorial limits of Texas. Article 8, § 3, prohibits the levy and collection of taxes, except by general laws and for public purposes only. The special act makes no attempt to levy and collect a tax, but simply authorizes Wichita county, a political subdivision of the state, and the state highway commission, another agency of the state, to expend taxes or funds legally collected by them under general laws for the purpose of building roads and bridges, to erect an interstate bridge, which by specific constitutional provision the Legislature was authorized to erect. The fact that the Constitution provides for the erection of interstate bridges establishes beyond dispute that they are for a public purpose, and since the Legislature has acted upon the unlimited power conferred by that constitutional provision, the question of whether the bridge serves a public purpose is precluded under the well-established rule that the Legislature is supreme in the matter. But if the inquiry is not precluded by the Constitution and legislative act, the evidence establishes beyond dispute that the bridge will serve a great public purpose of the county and states at interest in promoting social and commercial intercourse between them, and of the federal government as furnishing a better route between its well-established army posts located in Texas and Oklahoma.

[6] The provisions of article 3, §§ 50 and 51, prohibiting the Legislature from lending the credit of the state, or from making a grant of public money to individuals, etc., is of the same general nature as the public purpose provisions—that is, they define the general policies of this state with reference to how the Legislature shall expend public money—and for that reason what has been said as to one is applicable to all of them. Article 3, § 56, subd. 6, supra, specifically authorizes the erection of interstate bridges,

and, being a specific grant of power to do a particular thing, should and does control with respect to the special matter.

[7] Article 3, § 56, prohibits, except as therein provided, passage of special and local laws. Subdivision 6 is one of the exceptions, and authorizes the passage of local or special laws for the purpose of erecting interstate bridges, and therefore authorizes the special act in question.

[8] The special act is not void as violative of article 4, § 10 of the Constitution, for failure to direct the Governor to personally conduct the negotiations with Oklahoma with respect to the bridge, or as depriving the Governor of the constitutional right to conduct all intercourse and business of this state with another state. With reference to the questions the Constitution reads:

"He * * * shall conduct, in person, or in such manner as shall be prescribed by law, all intercourse and business of this state with other states. * * *"

The main object of the special act was to erect an interstate bridge. It is the state's business to erect such a bridge. Article 3, § 56, subd. 6, supra. One end of the bridge rests in Oklahoma and a portion of it spans her territory, and it necessarily follows that Texas must enter into some agreement with that state with reference to its construction. The constitutional provision in question requires the Governor to conduct that agreement, either in person or in such manner as shall be prescribed by law. The special act does not by specific language direct that the Governor shall conduct the business with Oklahoma, in fact it makes no reference to the Governor's duty in the matter, but the failure to do so does not render the act void. Why should the Legislature direct the Governor to perform an act which the Constitution has made his mandatory duty to perform? The Governor is charged with the duty of executing all laws enacted by the Legislature in the manner required by the Constitution and laws of this state, and the failure of the Legislature to specifically direct that officer to execute a law does not vitiate the law.

[9] The language, "he * * * shall conduct, in person, or in such manner as shall be prescribed by law, all intercourse and business of this state with other states," grants power to the Legislature to enact laws or pass resolutions directing such agency as it may deem proper to negotiate and conduct the business of this state with another state, and its negotiations, agreements or contracts, when approved by the Governor, shall become the binding contract of this state. With respect to a law its language must be construed in the light of the attending circumstances and of the object to be attained. The object of this law was to furnish a proper method or means of conducting all intercourse and business of this state with her sister states. It provides, first, that the Governor shall conduct that business in person; or, second, that it shall be conducted through such agency as the Legislature shall prescribe, its acts to become the acts of the state when approved by the Governor. This interpretation of the language becomes clear when viewed from the standpoint of the makers of the law, who must have known that contingencies, such as pressure of business, sickness, or other circumstances, might arise which would prevent the Governor from personally conducting and negotiating the business with the other state. Or they also must have known that the business might relate to technical and scientific matters in which the Governor was not trained or required to be trained. The matter of bridge building furnishes an apt of illustration of what the lawmakers had in mind. They knew that the building of a bridge of the magnitude of the one involved here would require the services of highly skilled engineers and materialmen. The special act follows this same idea. It is not mandatory, but merely directs that Wichita county may agree with Oklahoma, and that the state highway commission may grant aid for the erection of the bridge. Wichita county is a political subdivision of this state. Article 9, § 1, and article 11, § 1, of the Constitution. It is charged with the duty of building public roads and bridges within its territory. Article 11, § 2, of the Constitution. It has in its employment an engineer skilled in the matter of bridge building. The state highway commission is an agency of this state, "in which are vested powers to formulate and execute plans and policies for the location, construction and maintenance of * * * highways and public roads." Robbins v. Limestone County, 114 Tex. 345, 268 S. W. 915. The term "public roads" includes bridges. The commission employs many skilled engineers in the matter of road and bridge building. The negotiations with reference to the bridge in question, the construction of which was the main object of the special act, were conducted by the designated agency as directed by the act. These negotiations and agreements were reduced to written contracts, which were submitted to and approved by the Governor in all things. We therefore conclude that the special act is not in conflict with the constitutional provision, and that the acts of the agency appointed by the special law and those of the Governor were entirely sufficient to make the contracts the binding obligations of this state.

[10, 11] Nor do we think the special act deprived the Governor of her constitutional right to conduct the business in the manner prescribed by the constitutional provision in question. Although the special act does provide that another agency is to act in negoti-

ating and agreeing with Oklahoma upon the character, location, and terms of constructing the bridge, still, that did not deprive the Governor of participating in them in any manner, or of agreeing to and approving in all things the final agreements and contracts made by that agency with Oklahoma. The test to be used in determining the validity of the act with respect to this question is whether the plain and unambiguous language deprived the Governor of the right to conduct the business with Oklahoma in the manner prescribed by law. Maud v. Terrell, Comptroller, 109 Tex. 100, 200 S. W. 375. We submit that it does not. Neither the agency appointed by the act nor the Governor so construed it, but they acted together in the matter. To construe the language as depriving the agency appointed by the act and the Governor from acting together in the matter as provided by law would do violence to all rules governing courts in determining the validity of a legislative act. A primary rule is that:

"An act of the Legislature should not be declared unconstitutional unless it clearly appears to be so, and every reasonable doubt as to its validity must be resolved in favor of sustaining the act." Atkins v. State Highway Dept. (Tex. Civ. App.) 201 S. W. 227.

Or, as stated by Chief Justice Phillips, in Maud v. Terrell, supra:

"An act of the Legislature is not to be declared unconstitutional unless plainly so. The presumption is that the Legislature acted in the light of the Constitution, with the intention to observe it rather than violate it."

Appellees cite the case of State v. I. & G. N. Ry. Co., 89 Tex. 562, 35 S. W. 1067, as authority for their contention with respect to this question; but we have carefully examined the case and find that it furnishes no analogy of the case at bar. It simply holds that the Legislature could not appoint the county or district attorney of a certain county to bring suits to prevent any private corporation from exercising any power not authorized by law, because section 22, art. 4, of the Constitution, confers specific power and authority upon the Attorney General to bring such suits. The reasoning of that case is that appointment of the county or district attorney necessarily excluded the idea that the Attorney General was to act. The reasoning of that case has no application here, for the constitutional provision in question does not require that the Governor act alone and in person with reference to the contracts of this state with another state. The language, "or in such manner as shall be prescribed by law," necessarily implies that the Legislature may delegate an agency other than the Governor to negotiate and contract with another state for this state, which acts, when approved by the Governor, become the binding obligation of this state. With respect to this question a careful reading of the facts and reasoning in the case of Maud v. Terrell, Comptroller, supra, shows that that case furnishes a complete analogy of this question and supports our decision thereon.

So, we submit that there is no merit to any of the contentions made and upon which the judgment is based, and we therefore set aside the order appealed from, dissolve the injunction in all things, and dismiss the injunction proceedings.