# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3841
_____

Charles Jess Palmer,

      Appellant,

  v.

Harold W. Clarke, Director,
State of Nebraska Department of
Correctional Services,

      Appellee.

_____

National Association of Criminal
Defense Lawyers,

      Amicus on Behalf of
      Appellant.

Appeals from the United States
District Court for the
District of Nebraska.

_____

No. 03-3842
_____

Charles Jess Palmer,

      Appellee,

  v.

Harold W. Clarke, Director,
State of Nebraska Department of

Correctional Services,                    *
                                          *
              Appellant.                  *
                                          *
                                          *
_____                      *
                                          *
National Association of Criminal          *
Defense Lawyers,                          *
                                          *
              Amicus on Behalf of         *
              Appellee.                   *

                              _____

                Submitted:  December 13, 2004
                   Filed:  May 13, 2005
                              _____

Before WOLLMAN, LAY, and COLLOTON, Circuit Judges.
                              _____

WOLLMAN, Circuit Judge.

       Charles Jess Palmer and the State of Nebraska each appeal from the district
court's partial grant of Palmer's petition for writ of habeas corpus. We affirm in part
and reverse in part.


## I.  BACKGROUND

       Palmer has been tried, convicted, and sentenced to death three times for the
1979 felony murder of Eugene Zimmerman in Grand Island, Nebraska. The Nebraska
Supreme Court reversed Palmer's first conviction and death sentence because the
state trial court erroneously admitted hypnotically induced testimony. State v.
Palmer, 313 N.W.2d 648, 655 (Neb. 1981) (Palmer I). That court subsequently
reversed Palmer's second conviction and death sentence because the trial court
allowed Palmer's estranged wife (Cherie Palmer) to testify at trial in violation of

Nebraska's marital privilege. State v. Palmer, 338 N.W.2d 281, 284 (Neb. 1983) (Palmer II). The marital privilege, as it then existed, provided that: "During the existence of the marriage, a husband and wife can in no criminal case be a witness against the other. This privilege may be waived only with the consent of both spouses." Neb. Rev. Stat. § 27-505(a)(2) (Reissue 1995). Because of Palmer's appeal of a divorce decree in Texas, the couple's marriage had not yet terminated, and thus Cherie Palmer remained incapable of testifying against Palmer during the pendency of the second trial.

After Palmer's second conviction was reversed, but before his third trial, the Nebraska Legislature amended the marital privilege statute by rendering the privilege inapplicable in cases involving crimes of violence.[1] Neb. Rev. Stat. § 27-505(a)(3)(a) (Reissue 1995). As a result, Cherie Palmer was permitted to testify against Palmer in his third trial. Palmer was again convicted and again sentenced to death. On appeal, the Nebraska Supreme Court affirmed Palmer's conviction and sentence. State v. Palmer, 399 N.W.2d 706 (Neb. 1986) (Palmer III).

Before the start of his third trial, Palmer filed a federal habeas corpus petition, contending that his second trial violated his right against double jeopardy and that his impending third trial would also constitute a double-jeopardy violation because the properly admitted evidence in both his first and second trials was legally insufficient to convict him. After four hearings before the district court, four appeals to our court, and multiple remands, we dismissed Palmer's petition. See Palmer v. Drum, No. 84-8041 (8th Cir. May 10, 1984) (reversing dismissal of petition as premature); Palmer

_____

[1]Prior to the amendment, the privilege had been inapplicable only in cases where the crime charged was rape, adultery, bigamy, incest, child abandonment, or a crime committed against one spouse by the other or against a child of either. Palmer III, 399 N.W.2d at 714-15; Neb. Rev. Stat. § 27-505(a)(3)(a). The amendment replaced rape and adultery with the more general "crime of violence" category. Palmer III, 399 N.W.2d at 717.

v. Grammer, 863 F.2d 588 (8th Cir. 1988) (Palmer (Fed.) I) (dismissing Palmer's original petition but remanding the case to allow Palmer to amend); Palmer v. Clarke, 961 F.2d 771 (8th Cir. 1992) (Palmer (Fed.) II) (remanding amended petition to district court with instructions to consider prosecutorial misconduct argument); Palmer v. Clarke, 12 F.3d 781 (8th Cir. 1993) (per curiam) (Palmer (Fed.) III) (dismissing Palmer's amended petition).

Palmer subsequently filed a petition for post-conviction relief in Nebraska state court. The state district court denied Palmer's petition in its entirety, and the Nebraska Supreme Court affirmed. State v. Palmer, 600 N.W.2d 756 (Neb. 1999) (Palmer IV). Palmer next filed a twenty-two-claim federal habeas corpus petition challenging his third conviction and sentence. The district court denied the writ as to Palmer's third conviction, but granted the writ as to Palmer's resulting death sentence. The district court held that, because of errors committed during the sentencing phases of all three of Palmer's trials, the death penalty could not constitutionally be imposed upon Palmer. The district court granted a certificate of appealability as to the claims on which it denied relief, and the State appealed those claims on which the district court granted relief.

## II. STANDARD OF REVIEW

In habeas corpus cases, we review the district court's findings of fact for clear error and its legal conclusions *de novo*. Reagan v. Norris, 365 F.3d 616, 621 (8th Cir. 2004).

### A. Substantive Review of State Court Decisions

Our power to review underlying state court decisions in habeas corpus cases is restricted to the "limited and deferential review" mandated by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Ryan v. Clarke, 387 F.3d 785, 790 (8th Cir. 2004) (quoting Jones v. Luebbers, 359 F.3d 1005, 1011 (8th Cir.), cert. denied, 125 S. Ct. 670 (2004)). Under AEDPA, we may grant a writ of habeas corpus

-4-

only if the relevant state court decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). See also Ryan, 387 F.3d at 790.

The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [the Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or…decides a case differently than [the] Court has on a set of materially indistinguishable facts." Id. at 412-13. A decision constitutes an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. An incorrect decision is not necessarily unreasonable, and we may not grant a writ of habeas corpus unless the state court decision is both wrong and unreasonable. Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir.), cert. denied, 540 U.S. 851 (2003). A state court's determination of the facts is unreasonable "only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." Jones, 359 F.3d at 1011.

AEDPA applies, however, only to habeas petitions filed after its effective date—April 24, 1996. Ryan, 387 F.3d at 789. The applicability of AEDPA thus centers on what was before a federal court on that date. Woodford v. Garceau, 538 U.S. 202, 207 (2003). Accordingly:

-5-

> If, on that date, the state prisoner had before a federal court an application for habeas relief seeking an adjudication on the *merits* of the petitioner's claims, then amended § 2254(d) does not apply. Otherwise, an application filed after AEDPA's effective date should be reviewed under AEDPA, even if other filings by that same applicant…were presented to a federal court prior to AEDPA's effective date.

Id. (emphasis in original).

The district court held that Palmer's present habeas petition related back to his prior federal petition, and that AEDPA standards therefore did not apply, because we had "reserved judgment on the posttrial component" of Palmer's original habeas petition. We disagree for two reasons. First, Palmer's original petition in federal court contained no posttrial component. We noted in Palmer (Fed.) II that Palmer specifically stated that he was "not alleging and [was] expressly reserving any arguments [that] he [might] have arising out of his third trial" and that Palmer's original petition explicitly did not challenge his third judgment of conviction and sentence. 961 F.2d at 775 (modification in original). We also stated that a later petition attacking Palmer's third conviction would not qualify as a second or successive petition. Id. Accordingly, when Palmer's entire pretrial petition was denied in Palmer (Fed.) III, 12 F.3d at 783, there were no posttrial claims remaining on which to reserve judgment.

More importantly, Palmer's petition was not pending in federal court on April 24, 1996. In Palmer (Fed.) III, we clearly and categorically denied the habeas petition then pending before us. Id. The district court's conclusion that we held the petition "in abeyance" pending the conclusion of Palmer's third trial simply has no basis in the record. Our mandate issued, was received by the District of Nebraska, and was fully in force after the Supreme Court denied certiorari. See Palmer v. Clarke, 512 U.S. 1213 (1994). Furthermore, the district court's observations about the disposition of the case file and records following Palmer (Fed.) III cannot render nugatory our

clear language in that case.[2]  Accordingly, Palmer's present petition does not relate back to his prior petition, and AEDPA standards apply to all of Palmer's claims.

### B.  Fair Presentment

Before seeking federal habeas corpus relief, a petitioner must first fairly present the substance of each claim to the appropriate state court, thereby alerting the state court to the federal nature of each claim.  <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004); <u>Wemark v. Iowa</u>, 322 F.3d 1018, 1020-21 (8th Cir.), <u>cert. denied</u>, 540 U.S. 870 (2003).  A petitioner has fairly presented a claim when he has "properly raised the same factual grounds and legal theories in the state courts which he is attempting to raise in his federal habeas petition."  <u>Wemark</u>, 322 F.3d at 1021 (internal citations and quotations omitted).

## III.  CLAIMS ON WHICH THE DISTRICT COURT DENIED RELIEF

### A.  Claim I: *Ex Post Facto* Violation

Palmer first asserts that the application of the Nebraska Legislature's marital privilege amendment to his third trial constituted an *ex post facto* application of the amended statute.  <u>See</u> U.S. Const. art. I, § 10, cl. 1.  The Nebraska Supreme Court, relying on <u>Hopt v. Utah</u>, 110 U.S. 574 (1884), and <u>Thompson v. Missouri</u>, 171 U.S. 380 (1898), held that the marital privilege amendment (L.B. 696) simply modified a rule of evidence, and thus its application in Palmer's case did not violate the *ex post facto* prohibition.  <u>Palmer III</u>, 399 N.W.2d at 714-18.

In his seriatim opinion in <u>Calder v. Bull</u>, Justice Chase enumerated four categories of laws that he considered violative of the *Ex Post Facto* Clause.  3 U.S.

---

[2]The district court based its holding in part on the fact that the district court's file pertaining to Palmer's first habeas corpus petition was never officially closed. <u>Palmer v. Clarke</u>, 293 F. Supp. 2d 1011, 1022 (D. Neb. 2003).

386, 390 (1798).  The fourth of those categories consisted of "[e]very law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender."  Id. (opinion of Chase, J.).  In Hopt, decided almost ninety years later, the Court examined a pre-trial, post-offense statutory modification that permitted felons—who had theretofore been barred from being a witness in any case—to testify in both civil and criminal cases.  110 U.S. at 587-88.  The Court upheld the modification against an *ex post facto* challenge and held that statutes which "simply enlarge the class of persons who may be competent to testify in criminal cases" do not offend the *ex post facto* prohibition because they do not make any act criminal which was not criminal at the time of its commission, aggravate or increase the punishment for any crime over that prescribed when the crime was committed, or alter the degree or lessen the amount or measure of proof necessary to convict the defendant.  Id. at 589.  The Court later addressed a similar *ex post facto* challenge to a pre-trial, post-offense evidentiary change that permitted the previously barred introduction of other writings in order to prove the authenticity of disputed writings, and concluded that a state does not violate the *ex post facto* prohibition when it enacts a statute making competent to testify a class of persons who were excluded from doing so on public policy grounds at the time the offense was committed.  Thompson, 171 U.S. at 381, 386-87.

The Nebraska Supreme Court held that L.B. 696 was indistinguishable from the statutes considered in Hopt and Thompson and that it thus did not run afoul of *ex post facto* constraints.  Palmer III, 399 N.W.2d at 716-17.  Based on those cases, which were controlling at the time that Palmer III was decided, we do not believe that the Nebraska Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law.  L.B. 696 merely rendered a class of persons previously barred from acting as witnesses in criminal cases fully competent to testify from that point forward.  Furthermore, the fact that L.B. 696 rendered current spouses competent to testify in criminal cases did not make any acts criminal

that were not criminal when committed, increase the punishment for any crime over that applicable when the crime was committed, or alter the degree or amount of proof required to convict any defendant.

Palmer contends, however, that the Supreme Court's more recent decisions in Carmell v. Texas, 529 U.S. 513 (2000), and Stogner v. California, 539 U.S. 607 (2003), render the Nebraska Supreme Court's disposition of his *ex post facto* claim contrary to clearly established federal law or an unreasonable application thereof. We find his arguments unavailing. Even assuming, *arguendo*, that Carmell and Stogner—which were decided well after the Nebraska Supreme Court's 1986 decision in Palmer III—qualify as "old rules" under Teague v. Lane, 489 U.S. 288 (1989),[3] and thus must be taken into account in our consideration of clearly established federal law, see Taylor, 529 U.S. at 412, they do not affect our conclusion that Hopt and Thompson dispose of Palmer's claim.

In Carmell, a defendant challenged a modification to Texas's "corroboration or outcry" rule. 529 U.S. at 516. Prior to 1993, the rule stated that the testimony of certain minor victims of sexual assault could not support a conviction unless it was corroborated or unless the victim had informed another person within six months of the offense ("outcry"). Id. at 517-18. Texas then amended the statute to eliminate the corroboration or outcry requirement for all minor victims. Id. at 518. In holding that the statute could not be applied to crimes committed prior to its enactment, the Court specifically addressed Justice Chase's fourth category and held that it was directed at sufficiency of the evidence rules, which "mean that evidence is insufficient to convict *by the force of [those laws] alone*," as opposed to witness competency rules, which produce that result only in combination with the normally operative sufficiency

---

[3]An old rule is a rule announced in a Supreme Court case that was decided after a habeas corpus petitioner's judgment of conviction and sentence, but that was dictated by precedent existing before that judgment became final. Stringer v. Black, 503 U.S. 222, 227 (1992).

rule.  Id. at 551-52 & n.35 (emphasis in original).  Because a failure to supplement victim testimony with corroboration or outcry made that testimony insufficient to convict by the force of the pre-modification rule alone, the rule was a sufficiency of the evidence rule, and thus its pre-trial, post-offense modification lessened the amount of proof required to convict in violation of the *ex post facto* prohibition.  Id. at 530.  Put another way, the modification made a state case based solely upon victim testimony legally sufficient where, under the previous law, a case based solely upon victim testimony (even if sufficient to prove the defendant's guilt) was legally insufficient, and thus the application of the amended statute violated the *Ex Post Facto* Clause.  Id. at 530-31.

In contrast, even accepting, *arguendo*, Palmer's argument that Cherie Palmer's testimony was crucial to his conviction, the admission of that testimony pursuant to L.B. 696 merely served to make the case factually sufficient to convict without changing the legal sufficiency of the evidence standard.  Nebraska's prior marital privilege did not render cases presented without spousal testimony insufficient; rather, those cases were judged by whether they proved the defendant's guilt beyond a reasonable doubt.  Similarly, the fact that spousal testimony became admissible by virtue of L.B. 696's enactment does not necessarily make a case sufficient where it previously was insufficient.  Both before and after L.B. 696, the sufficiency of a case was judged by whether the factual evidence presented was sufficient to meet the legal sufficiency of the evidence standard: guilt beyond a reasonable doubt.[4]

In Stogner, the Court considered a statute that allegedly violated Justice Chase's second category of *ex post facto* laws.  539 U.S. at 612-13.  As support for its decision that the statute was unconstitutionally applied to crimes committed prior

_____

[4]Palmer also asserts that, even if L.B. 696 is merely an evidentiary rule, its attainder characteristic distinguishes it from other such rules.  Whatever this may mean for Palmer's bill of attainder claim, see *infra*, it is irrelevant to our *ex post facto* analysis.

to its enactment, the Court looked to the historical episodes cited by Justice Chase as alternative descriptions of his four categories, in which he detailed the various bad acts of Parliament that gave rise to our Constitution's *ex post facto* prohibition. Id. at 612-14. In his alternative description of the fourth category implicated here, Justice Chase stated that Parliament occasionally "violated the rules of evidence...by admitting...the oath of the wife against the husband." Id. at 612; Calder, 3 U.S. at 389. Palmer claims that this passage, in addition to the Court's citation in Stogner to Justice Chase's alternative descriptions, makes L.B. 696 an impermissible *ex post facto* law. We disagree.

As an initial matter, it is instructive to note that Justice Chase's opinion in Calder was written in the period in which each Justice gave his opinion seriatim. Thus, it is not a Supreme Court holding that would be included in the definition of "clearly established Federal law." Justice Chase's opinion has historical significance solely because his four categories have been viewed "as an authoritative gloss on the *Ex Post Facto* Clause's reach" by more recent Supreme Court decisions. See Carmell, 529 U.S. at 567 (Ginsburg, J., dissenting). Even if Calder did have full precedential force, however, the best argument that Palmer could make is that there is a conflict between Calder's alternative descriptions and the holdings in Hopt and Thompson, and thus that the applicable federal law is not clearly established. Furthermore, although the Court did rely upon Calder's alternative descriptions in striking down the statute at issue in Stogner, it neither implicitly nor explicitly held that Calder's alternative description of the fourth *ex post facto* category stands on equal precedential footing with the more traditional definition. Quite the opposite, the Court's brief treatment of the fourth category cited Carmell's analysis of that category. 539 U.S. at 615.

Accordingly, the Nebraska Supreme Court's disposition of Palmer's *ex post facto* claim was neither contrary to nor an unreasonable application of clearly established federal law.

## B. Claim II: Bill of Attainder

Palmer next claims that L.B. 696 functioned as an unconstitutional bill of attainder. U.S. Const. art. I, § 10, cl. 1. The Nebraska Supreme Court held that because L.B. 696 did not specify Palmer as its target, it did not constitute a bill of attainder. Palmer IV, 600 N.W.2d at 769-70.

In order to be termed a bill of attainder, a law must: (1) specify the affected persons; (2) impose punishment; and (3) lack a judicial trial. Selective Serv. Sys. v. Minn. Pub. Interest Research Group, 468 U.S. 841, 847 (1984). Historically, bills of attainder identified by name the persons they intended to punish. Id. Even if an individual is not identified by name, however, an enactment constitutes an attainder if it describes the individual "in terms of conduct, which, because it is past conduct, operates only as a designation of particular persons." Communist Party v. Subversive Activities Control Bd., 367 U.S. 1, 86 (1961). Thus, "when past activity serves as 'a point of reference for the ascertainment of particular persons ineluctably designated by the legislature' for punishment," the enactment may be an attainder. Selective Serv., 468 U.S. at 847 (quoting Communist Party, 367 U.S. at 87).

On its face, L.B. 696 makes no reference to Palmer and is generally applicable to all cases in which a crime of violence is alleged. Rather than distinguishing between persons charged with a crime, it appears to distinguish among criminal prosecutions in which the marital privilege is applicable. Thus, there is no way to determine which individuals were "ineluctably designated" by L.B. 696 for punishment. Notwithstanding the frequent references to Palmer in L.B. 696's legislative history, we cannot say that this fact alone renders the state court decision unreasonable.

Furthermore, even if the Nebraska Supreme Court's conclusion that L.B. 696 did not specify Palmer were found to be so completely belied by the record as to fail the unreasonableness standard of review, Palmer still would not be entitled to habeas

relief on this claim. Whether a law imposes punishment upon a certain individual requires three inquiries: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a [legislative] intent to punish." Selective Serv., 468 U.S. at 852 (internal citations and quotations omitted). L.B. 696 meets none of these tests. First, the disability imposed upon Palmer—the elimination of his ability to bar Cherie Palmer from testifying—does not equate to those deprivations historically viewed as punishment, e.g., imprisonment, banishment, confiscation of property, or deprivation of employment or participation in a trade or trade union. Nixon v. Adm'r of Gen. Svcs., 433 U.S. 425, 473-74 (1977). Second, "[l]egislation designed to guarantee the availability of evidence for use at criminal trials," such as L.B. 696, constitutes a valid nonpunitive exercise of legislative power. Id. at 477. Finally, the legislative record in this case cannot fairly be characterized as evincing an intent to punish. Although both the state senator from the victim's district and the prosecutor in Palmer's case specifically cited the reversal of Palmer's second conviction as a justification for L.B. 696, their testimony took place in a committee hearing, and both stated that they were testifying for themselves alone. See Palmer App., vol. II, at 413-16 (testimony of Senator Peterson and Hall County Attorney Steven Von Reisen). In addition, although Senator Peterson reiterated his personal appeal on the floor of the Unicameral and distributed a news release from the Hall County Board reflecting community sentiments towards Palmer, see Palmer App., vol. II, at 430 (statement of Senator Peterson), this isolated statement does not show that the Unicameral as a whole "was intent on encroaching on the judicial function of punishing an individual for blameworthy offenses." Nixon, 433 U.S. at 479. In fact, Senator Peterson's brief reference to Palmer's case was the only reference made to Palmer in floor debates, and the prosecutor in Palmer's case explicitly testified that, even with the marital privilege amendment, Palmer was entitled to a fair trial. See Palmer App., vol. II, at 416 (testimony of Steven Von Reisen). Because L.B. 696 cannot be characterized as "punishment,"

Palmer's bill of attainder claim accordingly fails regardless of whether L.B. 696 specifies him.

### C. Claim IX: Double Jeopardy

Palmer alleges that the prosecutor in his second trial and the judge that presided over that trial committed misconduct by allowing Cherie Palmer to testify in violation of Nebraska's then-existing marital privilege, and that such misconduct should bar his third trial on double jeopardy grounds. In Palmer (Fed.) III, however, we specifically affirmed the district court's conclusion that no prosecutorial or judicial misconduct had occurred during Palmer's second trial. 12 F.3d at 783. Furthermore, although we stated in Palmer (Fed.) II that a later petition challenging Palmer's third conviction would not be second or successive, 961 F.2d at 774-75, this claim again challenges Palmer's third trial on grounds identical to those raised and addressed in Palmer's prior federal habeas petition, to wit, that because of prosecutorial and judicial misconduct, Cherie Palmer's testimony in the second trial should be excluded when determining whether the evidence in the second trial was sufficient to convict Palmer. See Palmer (Fed.) III, 12 F.3d at 782. The record also indicates that the "goading to mistrial" argument presented by Palmer in this petition and the cases cited in support thereof were specifically raised and rejected by the district court in connection with the prior federal habeas petition. Thus, Palmer's double jeopardy claim qualifies as a second or successive claim under 18 U.S.C. § 2244(b)(1) and must be dismissed. See, e.g., Vancleave v. Norris, 150 F.3d 926, 929 (8th Cir. 1998).

### D. Claim X: Speedy Trial

Palmer claims that the seventeen-week delay between the reversal of his second conviction and the commencement of his third trial deprived him of his constitutional right to a speedy trial. If the length of the delay cannot be said to be presumptively prejudicial, however, there is no deprivation of the speedy trial right. Barker v. Wingo, 407 U.S. 514, 530 (1972).

The Nebraska Supreme Court, citing <u>Barker</u>, held that a seventeen-week delay is not presumptively prejudicial. <u>See</u> <u>Palmer III</u>, 399 N.W.2d at 721-22. This conclusion was not an unreasonable application of clearly established federal law.

### E. Claims XI-XIII: Admission of Certain Evidence

Palmer asserts that certain evidence in his third trial was admitted in violation of due process. In claim XI, he alleges that a pretrial photographic display shown to the victim's wife (Monica Zimmerman) was impermissibly suggestive because Palmer was noticeably taller than all of the other individuals in the display, and, accordingly, that Mrs. Zimmerman's subsequent in-court identification of Palmer should have been excluded. In claim XII, he argues that Mrs. Zimmerman's testimony in his second and third trials was impermissibly tainted by the hypnosis session that led to the exclusion of her testimony in the first trial. In claim XIII, he asserts that the combination of the photographic display and the hypnosis also rendered the photographic display impermissibly suggestive. The Nebraska Supreme Court held that the display was not impermissibly suggestive and that, even if it was, the totality of the circumstances surrounding Mrs. Zimmerman's review of the display rendered the display not "unduly suggestive." <u>Palmer III</u>, 399 N.W.2d at 720-21. In addition, the court held that Nebraska evidentiary rules, as well as the court's prior precedent, did not bar the introduction of Mrs. Zimmerman's testimony because the testimony related to matters of which she had knowledge before the hypnosis session. <u>Id.</u> at 719-20.

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968). Even if a photographic identification procedure is impermissibly suggestive, however, the "central question" regarding eyewitness identification at trial is "whether, under the totality of the circumstances, the

identification was reliable despite any suggestive or inappropriate pre-trial identification techniques." Trevino v. Dahm, 2 F.3d 829, 833 (8th Cir. 1993) (citing Neil v. Biggers, 409 U.S. 188 (1972)). In determining whether the identification was reliable, a court must consider: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the photographic display; and (5) the length of time between the crime and the photographic display. Biggers, 409 U.S. at 199. The existence of each factor is a factual determination to be made by the state court, Sumner v. Mata, 455 U.S. 591, 597 n.10 (1982) (per curiam), and is entitled to the requisite presumption of correctness.

Although the Nebraska Supreme Court stated that the photographic display was not suggestive because one could not determine the height of each subject (including Palmer) by looking at the pictures, it also held that "the totality of the circumstances ma[de] it abundantly clear that the photographic array was not unduly suggestive." Palmer III, 399 N.W.2d at 721. It thus appears that the court incorrectly introduced the Biggers factors, which address the inherent reliability of the in-court identification, into its suggestiveness analysis.

Even if the court erred in its analysis, Palmer is not entitled to relief on this ground unless his constitutional or statutory rights were violated. See 28 U.S.C. § 2254(a). The Nebraska Supreme Court specifically found that it took Mrs. Zimmerman "one to two" seconds to eliminate all other subjects but Palmer from the photographic array. The district court additionally found that Mrs. Zimmerman had observed Palmer in her home on several occasions, had described his approximate age, height, and hair color one day after the murder, and was positive about the identification made from the photographic array. There is ample support for these findings in the record, and Palmer did not dispute them. Furthermore, the record indicates that Mrs. Zimmerman last saw Palmer approximately three weeks before she

-16-

picked him out of the photographic array. Based on a totality of the circumstances, we conclude that Mrs. Zimmerman's in-court identification of Palmer was inherently reliable, despite any potentially suggestive features of the photographic array, and thus properly admissible at trial.

The fact that Mrs. Zimmerman's hypnosis session took place before the photographic array and the in-court identification of Palmer does not alter our conclusion. The "suggestions" made to Mrs. Zimmerman in the hypnosis session regarding the physical features of the person she suspected had murdered her husband were vague and based upon facts that she had already disclosed to investigators. Additionally, any suggestions could not have been made with Palmer in mind, as Palmer's identity and physical appearance were not known to police until the photographic array took place almost two weeks later. Finally, and most importantly, there is no evidence that the Austin, Texas, Police Department personnel who conducted the photographic array knew of the hypnosis session or its results. Accordingly, the existence of the hypnosis session does not shift the totality of the circumstances toward a finding that Mrs. Zimmerman's in-court identification of Palmer was unreliable.[5]

We also uphold as not contrary to clearly established federal law the Nebraska Supreme Court's determination that Mrs. Zimmerman's testimony in the second and third trials was admissible despite the hypnosis session. The admissibility of evidence in a state trial is a matter of state law, and thus we will grant habeas relief only if the state court's evidentiary ruling "infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process." Clark v. Groose, 16 F.3d 960, 963 (8th Cir. 1994) (internal citations omitted). The Nebraska

---

[5]Palmer framed his argument as whether the hypnosis session, in combination with the photographic array, made the array unduly suggestive. We believe, however, that the proper inquiry is whether the hypnosis session rendered Mrs. Zimmerman's in-court identification unreliable.

Supreme Court found that Mrs. Zimmerman's testimony was properly limited to facts that she knew and had disclosed to others prior to the hypnosis session, Palmer III, 399 N.W.2d at 719, and there is ample evidence in the record to support this finding. Therefore, the admission of Mrs. Zimmerman's testimony resulted in no violation of due process or of any other constitutional protection.

### F. Claim XIX: Warrantless Arrest and Seizure of Evidence

Palmer next argues that his arrest in Texas (prior to his first trial), and the seizure of evidence from him at that time, violated his Fourth Amendment rights. A Fourth Amendment claim is not cognizable on federal habeas review unless the state fails to provide "an opportunity for full and fair litigation of [the] claim." Stone v. Powell, 428 U.S. 465, 494 (1976). Thus, we will review a Fourth Amendment claim raised in a habeas petition only if either "the state provided no procedure by which the prisoner could raise his Fourth Amendment claim, or the prisoner was foreclosed from using that procedure because of an unconscionable breakdown in the system." Willett v. Lockhart, 37 F.3d 1265, 1273 (8th Cir. 1994) (en banc). Palmer does not dispute that his Fourth Amendment claim was reviewed and decided by the Nebraska Supreme Court in Palmer I, 313 N.W.2d at 652, and thus we need not reexamine that court's decision.

### G. Claim XVIII: Death by Electrocution

Palmer asserts that Nebraska's current method of carrying out the death penalty by electrocution constitutes cruel and unusual punishment in violation of the Eighth Amendment. He concedes, however, that he did not challenge electrocution as a method of execution in state court and thus procedurally defaulted the claim. We nevertheless may review a procedurally defaulted claim, however, if a habeas petitioner shows "cause for the default and prejudice from the alleged violation of his rights." Evans v. Luebbers, 371 F.3d 438, 443 (8th Cir. 2004), cert. denied, 125 S. Ct. 902 (2005).

Palmer argues that cause exists to excuse his procedural default because (1) the dearth of executions in Nebraska between 1972, when the Supreme Court declared the death penalty unconstitutional in Furman v. Georgia, 408 U.S. 238, and 1995, when his post-conviction evidentiary hearing took place, rendered the factual basis of his claim unavailable, and (2) legal and social trends rejecting electrocution as a method of execution had not emerged prior to his evidentiary hearing. We disagree that these allegations establish cause for Palmer's procedural default. Although Nebraska executed only one person between 1972 and 1995 (Harold Otey, executed September 6, 1994), the record indicates that information about that execution, including pictures thereof and the procedures used therein, were available at the time of Palmer's evidentiary hearing. Thus, the factual predicate for his Eighth Amendment claim was available during the state post-conviction process. See also Williams v. Hopkins, 130 F.3d 333, 336-37 (8th Cir. 1997) (holding that factual predicate underlying challenge to Nebraska electrocution procedure was available, at the very least, at the time of Otey's execution). Furthermore, Palmer's argument that, since 1997, one state has abandoned electrocution as a method of execution and three states have provided for lethal injection as an alternative to electrocution does nothing to change our 1997 holding that "there is no argument even plausible that there are differences in the level of 'evolving decency' among the different circuits or states of the union, or over the last very few years," that justifies a holding that the practice of electrocution constitutes cruel and unusual punishment. Id. at 337 (quoting In re Sapp, 118 F.3d 460, 464 (6th Cir. 1997)). Accordingly, Palmer cannot show cause for his procedural default, and his Eighth Amendment claim is not cognizable on federal habeas review.

## IV. CLAIMS ON WHICH THE DISTRICT COURT GRANTED RELIEF

### A. Claims III, IV, and V: Proportionality Review

Palmer argues in claims III and IV that his Eighth Amendment, Fourteenth Amendment, and procedural due process rights were violated by the Nebraska Supreme Court's improper interpretation and application of Nebraska's statutorily mandated proportionality review scheme. See Neb. Rev. Stat §§ 29-2521.02–29-2521.03 (Reissue 1995). He asserts that, by abandoning its previous precedents and construing the Nebraska requirement of comparison with "previous cases involving the same or similar circumstances" to require comparison of his case only with cases in which the death penalty was imposed, Palmer III, 399 N.W.2d at 736, the Nebraska Supreme Court improperly refused to consider similar cases in which life imprisonment was imposed. Both the Supreme Court and this court have held, however, that the Constitution does not require a federal court to reexamine a state court's proportionality finding in order to adjudge "the manner in which the court conducted its review or whether the court misinterpreted the [state proportionality] statute." Six v. Delo, 94 F.3d 469, 478 (8th Cir. 1996). See also Walton v. Arizona, 497 U.S. 639, 656 (1990), overruled in part on other grounds, Ring v. Arizona, 536 U.S. 584, 609 (2002).

To the extent that Palmer also claims that the Nebraska Supreme Court's decision to affirm his sentence based on its new interpretation of the proportionality statute, rather than to remand the case to the trial court in accordance with Nebraska's two-tier proportionality review, violated his procedural due process rights and amounted to an unconstitutional appellate resentencing (claim V), we hold that such claims are procedurally defaulted. In his motion for rehearing in Palmer III, as well as his pleadings in Palmer IV, Palmer argued only that the Palmer III court had incorrectly conducted its proportionality review and that its new construction of the

proportionality statute should not have been retroactively applied to his case.[6] Neither those documents nor the Nebraska Supreme Court's Palmer IV opinion make any mention of a claim that Palmer was unconstitutionally deprived of the two-tier process or that the court's use of the new proportionality review standard constituted an appellate resentencing.[7] Because Palmer presented neither the factual basis nor the federal legal substance of these claims in state court, and because he has shown no cause to excuse his procedural default, his claims are not cognizable on federal habeas review. See Wemark, 322 F.3d at 1021.

## B. Claims VI & VII: Vagueness of Exceptional Depravity Aggravating Circumstance and Appellate Resentencing

Palmer claims that the "exceptional depravity" aggravating circumstance applied to justify his third sentence, see Neb. Rev. Stat. § 29-2523(1)(d) (Reissue 1995), was unconstitutionally vague and that he was deprived of his due process right to two-tiered sentencing review when the Nebraska Supreme Court "resentenced" him under a reformulated version of the aggravator.

At Palmer's third sentencing hearing, the sentencing panel specifically found that two aggravating circumstances were present in Palmer's case. First, the panel found "that the murder was committed in an apparent effort to conceal defendant's identity as the perpetrator of the robbery." Palmer III, 399 N.W.2d at 713. Second, the panel found that Zimmerman's murder "manifested exceptional depravity by ordinary standards of morality and intelligence." Id. Without in any way

---

[6]Although Palmer argues that the retroactive application of the "exceptional depravity" aggravating circumstance to his case deprived him of fair notice in violation of due process, see infra, he makes no such claim with regard to the Palmer III court's construction of the proportionality review process.

[7]Palmer does, however, make such a claim respecting the Nebraska Supreme Court's reformulated "exceptional depravity" aggravator. See infra.

acknowledging that the definition of "exceptional depravity" applied at Palmer's third sentencing hearing was vague, the Nebraska Supreme Court reformulated the aggravator to include a list of five factors[8] originally laid out by the Arizona Supreme Court in State v. Gretzler, 659 P.2d 1 (1983). Palmer III, 399 N.W.2d at 731-32. The court then reweighed aggravating circumstances (including the reformulated exceptional depravity aggravator) against mitigating circumstances in order to determine whether Palmer's death sentence was warranted. Id. at 732-33.

We subsequently held in a separate case that the definition of exceptional depravity applied at Palmer's sentencing hearing was unconstitutionally vague. See Moore v. Clarke, 904 F.2d 1226, 1233 (8th Cir. 1990). We have recognized, however, that the saving interpretation applied in Palmer III was "clearly constitutional." Joubert v. Hopkins, 75 F.3d 1232, 1244 & n.8 (8th Cir. 1996) (citing Walton, 497 U.S. at 654-55). Accordingly, Palmer's vagueness claim fails.

Palmer also is not entitled to relief on his due process/appellate resentencing claim because state appellate courts in states that weigh aggravating circumstances against mitigating circumstances (such as Nebraska) are permitted to cure the constitutional deficiency that results from a trial court's application of an unconstitutionally vague aggravating circumstance either by reweighing the aggravating and mitigating circumstances or by engaging in traditional harmless error analysis. Id. at 1244 (citing Clemons v. Mississippi, 494 U.S. 738, 754 (1990)). Such courts are permitted to do so even when state law vests primary death penalty sentencing authority in a lower body. Reeves v. Hopkins, 76 F.3d 1424, 1429 (8th Cir. 1996), rev'd in part on other grounds, 524 U.S. 88 (1998). This procedure is constitutionally available only if Nebraska state law, as interpreted by the Nebraska

---

[8]"(1) [T]he apparent relishing of the murder by the killer, (2) the infliction of gratuitous violence on the victim, (3) the needless mutilation of the victim, (4) the senselessness of the crime, and (5) the helplessness of the victim." Palmer III, 399 N.W.2d at 731.

-22-

Supreme Court, authorizes it. See id. at 1428-29. If a state appellate court determines that it is authorized to reweigh, it may do so by applying a corrected and constitutional definition of the vague aggravator. Id. at 1428.

Prior to 2000, the Nebraska Supreme Court had determined that it possessed the authority to reweigh. See Reeves v. Hopkins, 76 F.3d at 1430. The court in Palmer III conducted an extensive analysis of both the aggravating and mitigating circumstances allowable under Nebraska law, and determined that at least one aggravating circumstance (the reformulated "exceptional depravity" aggravator) was established beyond a reasonable doubt and that no mitigating circumstances were established. 399 N.W.2d at 732-33. Assuming, *arguendo*, that this analysis constituted a reweighing of the aggravating and mitigating circumstances in Palmer's case, the court's findings, combined with the majority's proportionality review, were sufficient to justify the imposition of the death penalty under Nebraska law. See Neb. Rev. Stat. § 29-2522 (Reissue 1995).

Finally, Palmer contends that State v. Reeves, 604 N.W.2d 151 (Neb. 2000), establishes that the Nebraska Supreme Court no longer has the ability to reweigh aggravating and mitigating circumstances. Even if this is true, however, it does not affect our analysis. A state court's subsequent reconsideration of its ability to reweigh is irrelevant to federal habeas review. Reeves v. Hopkins, 76 F.3d at 1429-30. Once the state court has asserted authority to reweigh in the petitioner's case, the issue is removed from the federal arena. Id. at 1430.

### C. Claim VIII: Lack of Notice of Reformulated Exceptional Depravity Aggravating Circumstance

Palmer alleges that the Nebraska Supreme Court's reformulation of the "exceptional depravity" aggravator deprived him of notice that his conduct would subject him to the death penalty, in violation of the Fourteenth Amendment. In Palmer IV, the Nebraska Supreme Court stated that a person has sufficient notice of the scope of an aggravating circumstance which may be applied at a sentencing

hearing where: "(1) the language of the statute and previous constructions of it in existence at the time of the sentencing hearing" provide "reasonable notice to a person of ordinary intelligence of the scope of criminal behavior reached by the aggravating circumstance"; and "(2) any new construction of the aggravating circumstance which occurs after the hearing does not increase the scope of the behavior considered under that particular aggravating circumstance." 600 N.W.2d at 771. We have explicitly approved a similar construction of the Fourteenth Amendment's fair notice requirement as "clearly not an unreasonable application of federal law as established by the Supreme Court." Moore v. Kinney, 320 F.3d 767, 775-76 (8th Cir. 2003) (en banc). The construction we approved, however, examined the defendant's knowledge at the time of the crime.[9] See id.

The Palmer IV court's test, once the first prong is corrected to focus on the time of the crime rather than the time of the sentencing hearing, "correctly identifie[s] the Supreme Court's rule regarding notice of a statute's subsequent construction as it may affect sentencing." Kinney, 320 F.3d at 776. Accordingly, we utilize that test in order to conduct our review. The Nebraska Supreme Court found that Palmer inflicted gratuitous violence on a helpless victim, and thus that his crime "manifested exceptional depravity." Palmer III, 399 N.W.2d at 732. The court additionally found that cases in which exceptional depravity was found and which predated Palmer's 1979 acts also involved the infliction of gratuitous violence on helpless victims. Id. See, e.g., State v. Holtan, 250 N.W.2d 876, 880 (Neb. 1977) (exceptional depravity found where defendant "killed...unresisting victims"); State v. Peery, 261 N.W.2d 95, 105 (Neb. 1977) (exceptional depravity found where defendant repeatedly shot

[9]It appears that the Nebraska Supreme Court misquoted its own governing standard. Compare Palmer IV, 600 N.W.2d at 771 (citing State v. Moore, 553 N.W.2d 120 (Neb. 1996)) with State v. Moore, 553 N.W.2d at 134. Because notice analysis focuses on the defendant's knowledge at the time of the crime, the first prong of the test applied by the Nebraska Supreme Court in Palmer IV misstates the constitutional requirement. See Bouie v. City of Columbia, 378 U.S. 347, 354 (1964).

"thoroughly" bound victim).  We cannot say that this comparison to pre-existing cases was unreasonable.  See Colvin, 324 F.3d at 587 (state court decision must be both wrong and unreasonable to warrant habeas relief).

In addition, because the Gretzler factors adopted in Palmer III constituted a narrowing construction of the exceptional depravity prong, the Nebraska Supreme Court did not "increase the scope of actionable behavior considered by the sentencers."  Kinney, 320 F.3d at 777 (internal citations omitted).  Thus, Palmer was not deprived of fair notice of the narrowed aggravator.

### D.  Claim XXII: Jury Sentencing

Palmer's claim that, under Ring v. Arizona, he was entitled to have the facts at his sentencing hearing proved to a jury beyond a reasonable doubt is foreclosed by the Supreme Court's holding in Schriro v. Summerlin, 124 S. Ct. 2519, 2526 (2004), that Ring does not apply retroactively.[10]

### E.  Claim XIV: Felony Murder

Palmer claims that the death penalty cannot, consistent with the Eighth Amendment, be imposed upon him for the crime of felony murder because no court has found that he had an intent to kill Zimmerman.  The Palmer IV court, citing State v. Rust, 388 N.W.2d 483 (Neb. 1986), denied this claim on the ground (stated in Rust) that the Supreme Court prohibited the imposition of the death penalty only when a defendant does not himself kill, attempt to kill, or intend that a killing take place.  Palmer IV, 600 N.W.2d at 769; Rust, 388 N.W.2d at 492-93.  This is an accurate statement of the Supreme Court's test.  In Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona,  481 U.S. 137 (1987), the Supreme Court held that the Eighth Amendment is satisfied by a showing that the defendant actually killed, attempted to kill, or intended to kill the victim.  Tison, 481 U.S. at 150.  See also

---

[10]The district court did not have the benefit of the Schriro decision at the time of its opinion in this case.

Cabana v. Bullock, 474 U.S. 376, 386 (1986), abrogated on other grounds, Pope v. Illinois, 481 U.S. 497, 503 n.7 (1987); Murray v. Delo, 34 F.3d 1367, 1376 (8th Cir. 1994). Because the Nebraska Supreme Court, as well as the jury in Palmer's third trial,[11] determined that the record in this case showed that Palmer alone killed Zimmerman, Palmer III, 399 N.W.2d at 733, the death penalty may constitutionally be imposed upon Palmer. See Cabana, 474 U.S. at 386-88 (so long as any state court makes the requisite finding, the Eighth Amendment is satisfied). Accordingly, the Nebraska Supreme Court's disposition of this claim was not contrary to or an unreasonable application of clearly established federal law.

### F. Claim XV: Failure to Instruct on Lesser Included Offenses

Palmer claims that he was deprived of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights because the trial court in his third trial failed to instruct the jury on the lesser included offenses of manslaughter and second degree murder. The United States Supreme Court has upheld the Nebraska Supreme Court's determination that, in Nebraska, felony murder has no lesser included offenses. Hopkins v. Reeves, 524 U.S. 88, 96-100 (1998). See also Palmer III, 399 N.W.2d at 724. Accordingly, Palmer's claim is without merit.

### G. Claims XVI, XVII, XX, and XXI: Ineffective Assistance of Counsel

Palmer alleges that he was deprived of the effective assistance of counsel at various points in his trial process.[12] We discuss each claim in turn.

---

[11]In order to convict a defendant of felony murder in Nebraska, a jury must find that the defendant actually killed the victim. See Neb. Rev. Stat. § 28-303(2) (Reissue 1995).

[12]The district court granted habeas relief on Claims XX and XXI, but did not discuss Claims XVI and XVII.

### 1. Claims XVI and XVII

Palmer claims that if his counsel had objected to Cherie Palmer's testimony at the time it was introduced at his first sentencing hearing or during the direct appeal of his second conviction, the prosecution would not have been able to prove the existence of aggravating circumstances and thus Palmer would have been "acquitted" of the death penalty.[13] As a result, the State would have been barred from seeking the death penalty against him in both his second and third trials. The Nebraska Supreme Court analogized these claims to a claim that the evidence presented at sentencing, absent Cherie Palmer's testimony, was insufficient to prove the existence of aggravating circumstances. Palmer IV, 600 N.W.2d at 774-76. The court then stated that, under Lockhart v. Nelson, 488 U.S. 33 (1988), both properly and improperly presented evidence could be examined to determine whether the evidence presented at Palmer's first sentencing hearing was sufficient to prove the existence of aggravating circumstances, and ultimately held that the totality of the evidence was sufficient. Palmer IV, 600 N.W.2d at 776-79. See also Lockhart, 488 U.S. at 40-42. As a result, the court applied the "clean slate" rule and held that any errors pertaining to the first sentencing were corrected by Palmer's retrial.[14] Palmer IV, 600 N.W.2d at 778. See also Bullington v. Missouri, 451 U.S. 430, 442-43 (1981).

---

[13]Our review of the record indicates that Palmer's counsel did, in fact, object to the presentation of Cherie Palmer's testimony at the first sentencing hearing. See St. D. Ct. File, Ex. 105, vol. VIII, at 984-85. His counsel's objection, however, apparently concerned the Nebraska statute addressing the permissible content of presentence investigations. See id.; Neb. Rev. Stat. § 29-2261 (Reissue 1995). Because Palmer's present claim is that the introduction of Cherie Palmer's testimony violated the Nebraska marital privilege statute, see Neb. Rev. Stat. § 27-505, we must continue with our analysis.

[14]The "clean slate" rule states that where a defendant succeeds in overturning his conviction, there is no double jeopardy bar to retrial. Bullington, 451 U.S. at 441-42. The clean slate rule is inapplicable, however, when the ground for the reversal was that the evidence was insufficient to convict. Id. at 442. These concepts are equally applicable to trials and sentencing hearings. Id. at 446; Palmer IV, 600 N.W.2d at 775 (explicitly holding that double jeopardy concerns apply in Nebraska sentencing hearings).

To make out a claim of ineffective assistance of counsel, a defendant must show: (1) that his counsel's performance was deficient; and (2) that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Although the Nebraska Supreme Court did not apply this test, which certainly qualified as clearly established federal law when Palmer IV was decided, we cannot say that the court's ultimate disposition of these claims was either contrary to Strickland or an unreasonable application of Lockhart. In Lockhart, the United States Supreme Court addressed the claims of a habeas corpus petitioner who claimed (as Palmer does) that his sentence enhancement was based on improperly admitted evidence (a pardoned conviction). 488 U.S. at 34-36. The petitioner claimed that, without the improperly admitted evidence at his first sentencing hearing, the evidence presented in support of the enhancement was insufficient and thus double jeopardy prevented the state from seeking the enhancement at any subsequent resentencing. Id. at 37. The Court held that even though the evidence in support of the enhancement in the petitioner's case was clearly insufficient absent the pardoned conviction, a reviewing court must consider all of the evidence admitted by the trial court—both correctly and incorrectly—in order to determine whether the evidence at the disputed proceeding was sufficient to convict, and therefore whether double jeopardy permits retrial. Id. at 40-41. The Court also held that the erroneous admission of evidence at trial is a "trial error" that is fundamentally different from a finding that the evidence was insufficient to convict. Id. at 40.

Palmer's claims are somewhat different. He claims that he is entitled to more expansive double jeopardy protection because the failure to object to the trial court's erroneous admission of Cherie Palmer's testimony at his first sentencing hearing and the failure to argue the issue during his second direct appeal constituted ineffective assistance of counsel. We see no reason, however, why Palmer should be able, via an ineffective assistance claim, to obtain relief that he would not be entitled to via a claim of trial error. It is plain, given Lockhart, that Nebraska would have been permitted to seek the death penalty in the second and third sentencing proceedings if Palmer's sole claim had been the erroneous admission of Cherie Palmer's testimony,

because any finding that the introduction of such testimony warranted reversal would be based on trial error rather than sufficiency of the evidence. Thus, any reviewing court would be permitted to consider all of the evidence—including Cherie Palmer's testimony—in deciding whether the evidence at the first sentencing hearing was sufficient to convict.

That Palmer frames the issue as ineffective assistance of counsel, rather than trial error, does not change the fact that Palmer still would have to prove prejudice to his case even if we were to find that his counsel performed deficiently in failing to object to Cherie Palmer's sentencing testimony. He cannot do so. Any potential prejudice to his case would have resulted from the erroneous admission of Cherie Palmer's testimony. As the Supreme Court has stated, however, such an error is a trial error, rather than an issue of evidentiary sufficiency, and thus the clean slate rule is fully applicable. Accordingly, any errors resulting from Palmer's first sentencing hearing were cured by his second and third sentencing hearings, and thus the clean slate rule eliminated any possible danger of prejudice from the alleged deficient performance.[15]

### 2. Claims XX and XXI

Palmer asserts that his counsel also was ineffective for conceding the existence of Nebraska's "killing to conceal one's identity" aggravating circumstance, Neb Rev. Stat. § 29-2523(1)(b), in his first sentencing hearing and for failing to conduct any investigation into mitigating and aggravating circumstances, to direct his probation

---

[15]Although Palmer did not make such an argument in his habeas petition, the district court granted habeas relief on the ground that Palmer's counsel had failed to conduct a proper investigation into statutory or nonstatutory mitigating factors. Because Palmer's second and third sentencing hearings cured any possible prejudice resulting from errors at his first sentencing hearing, however, he is not entitled to relief on that ground. In addition, we agree with the Tenth Circuit's view that a district court may not "rewrite a petition to include claims that were never presented." Barnett v. Hargett, 174 F.3d 1128, 1133 (10th Cir. 1999) (quotations omitted).

officer to investigate Palmer's personal history, or to interview Cherie Palmer in preparation for his third sentencing hearing.

The Palmer IV court reviewed these claims under its own test for ineffective assistance of counsel:

> "[T]o sustain a claim of ineffective assistance of counsel as a violation of the Sixth Amendment of the U.S. Constitution and article I, § 11, of the Nebraska Constitution, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defendant, that is, demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different."

600 N.W.2d at 771 (quoting State v. Hunt, 580 N.W.2d 110, 113 (Neb. 1998)). This accurately states the United States Supreme Court's test. See Strickland, 466 U.S. at 687, 694.

The Palmer IV court first determined that Palmer's counsel's decision to concede the 1(b) aggravator did not constitute deficient performance, and, accordingly, that the counsel's assistance at the first sentencing hearing was not ineffective. 600 N.W.2d at 771-72. This conclusion was not an unreasonable application of Strickland. Although it is true, as the district court observed, that all murders render the victim incapable of identifying the perpetrator, it does not follow that all victims would be capable of identifying the perpetrator in the first instance. There was specific evidence in this case that the victim knew Palmer and his wife by name and had met Palmer and his wife on at least three separate occasions prior to the murder. Given that Palmer apparently had no evidence to contradict these facts, he cannot overcome the presumption that his counsel's decision to concede the aggravator's existence was "sound trial strategy." Strickland, 466 U.S. at 689.

Similarly, Palmer's complaints that his counsel should have conducted (or instructed others to conduct) more thorough investigations prior to Palmer's third

-30-

sentencing hearing are without merit. The Nebraska Supreme Court denied these claims on the basis that the decisions not to conduct further investigation into each challenged aspect of Palmer's case did not constitute deficient performance and, furthermore, that Palmer could prove no prejudice to his case. We agree.

To show ineffective assistance of counsel, Palmer must affirmatively prove prejudice to his case, <u>Strickland</u>, 466 U.S. at 693, by "show[ing] that there is a reasonable probability that, but for [his] counsel's unprofessional errors," the result of his sentencing proceeding would have been different. <u>Id.</u> at 694. He has not made this showing with respect to any of his counsel's alleged errors. First, although he argues that his counsel should have interviewed Cherie Palmer prior to his third sentencing hearing, he has not shown what, if any, additional information would have been gleaned from such an interview, let alone how such information would have affected the outcome of his trial. Throughout three trials and three sentencing hearings, the content and character of Cherie Palmer's testimony was undoubtedly well known to both defendant and his counsel. In addition, Palmer has not alleged what, if any, additional information about any aspect of his case would have been gleaned from an expanded investigation by his probation officer. Such general allegations do not satisfy the requirement that Palmer affirmatively prove prejudice.

Finally, with regard to aggravating and mitigating circumstances, Palmer has again failed to show what, if any, statutory or non-statutory mitigating factors would have been uncovered through further investigation. Although the district court stated that, through further investigation, Palmer's counsel might have discovered information about Palmer's difficult childhood, such evidence was in fact presented to the sentencing panel, and Palmer's counsel made an extensive reference to Palmer's family history in his argument before the panel. <u>See</u> <u>Palmer III</u> Trial Tr., vol.V, at 912 (introduction of deposition of Palmer's sister), 917 (same), 934 (argument). The sentencing panel had an opportunity to review this information and hear argument on it, and it obviously did not change their "appraisal of moral culpability." <u>See</u> St. D. Ct. File, Ex. 118, vol. IV, at 665-66 (order of sentence in

third sentencing hearing, specific discussion and rejection of Palmer's family history as a mitigating circumstance).[16]

## V. CONCLUSION

The district court's partial denial of Palmer's habeas corpus petition is affirmed, its partial grant of the petition is reversed, and the case is remanded to the district court with directions to dismiss the petition in its entirety.

_____

[16]Palmer also argues that further investigation and research would have led his counsel to argue that the "exceptional depravity" aggravator was unconstitutionally vague. His counsel did make such an argument on appeal, however.